# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIM.  NO. 3:15cr67 (WWE)** |
| **v.** | : | **AUGUST 11, 2015** |
| **ROBERT  GENTILE** | : | |

## GOVERNMENT'S RESPONSE  TO
## <u>DEFENDANT'S MOTION  TO DISMISS</u>

Comes now the United States, by and through its undersigned counsel, to respond to the defendant's Motion to Dismiss dated July 21, 2015 in the above-captioned matter. The defendant's motion is premised on the claim that the Government chose to target him for criminal investigation and caused him to engage in criminal conduct relating to the sale of a handgun and possession of ammunition as a means of forcing him into cooperating in its investigation into the largest art theft in history, that is, the theft of thirteen pieces of artwork, including a number of old masterpieces, from the Isabella Stewart Gardner Museum located in Boston, Massachusetts back in March of 1990. Memorandum of Law in Support of Motion to Dismiss (dated July 21, 2015) ("Def. Mem. II") at 1-2.[1] In doing so, he alleges, the Government engaged in "outrageous" conduct that deprived the defendant of his due process rights under the Fifth Amendment. Motion to Dismiss at 1 (Doc. 29); Def. Mem. II at 1. As an initial matter, the Governments notes that (a) the defendant's motion is modeled after his 2012 Motions to Dismiss two earlier indictments relating to the distribution of controlled

---

[1] For purposes of clarity, the virtually identical Defendant's Memorandum of Law in Support of Motion to Dismiss (dated July 2, 2012) will be referred to as "Def. Mem. I."  The Memorandum of Law in Support of Motion to Dismiss (dated July 21, 2015) filed in this case will be referred to hereinafter as "Def. Mem. II."

substances and the illegal possession of multiple firearms, ammunition and silencers, again based on a theory of outrageous government conduct, which were denied (Chatigny, J.),[2] and (b) there appears to be no reported case in the Second Circuit where a motion to dismiss an indictment on the grounds of purported "outrageous" government conduct denying a defendant his due process rights has actually been granted.

For the reasons set forth below, this case does not present facts that support the defendant's contentions, and therefore, the motion should be denied, with the defendant being free to pursue an affirmative defense of entrapment at trial if he should choose to do so.

## I. INTRODUCTION

(1) <u>Nature of Defendant's Claims</u>

The instant motion is one clearly modeled after defendant's earlier pleadings filed on July 2, 2012 in *Gentile I-A* and *Gentile I-B*.[3]   In those pleadings, the defendant claimed that the indictments returned against him for Possession and Conspiracy to Possess with Intent to Distribute OxyContin, Dilaudid and Percocet in violation of 21 U.S.C. §§ 841(a)(1) and 846, and Possession of Firearms and Ammunition by a Felon, in violation of 18 U.S.C. § 922(g)(1),  and Possession of Unregistered Silencers, in violation of 26 U.S.C. §§ 5841, 5845(a)(1), 5861(d) and 5871, should be dismissed, because the Government engaged in outrageous conduct that violated

---

[2] See *United States v. Robert Gentile and Andrew Parente*, Crim. No. 3:12CR34 (RNC), Docket Entry 49, (hereinafter '*Gentile I-A*") and *United States v. Robert Gentile*, Crim. No. 3:12CR72 (RNC), Docket Entry 19 (hereinafter "*Gentile I-B*").

[3] This earlier pleading was in turn based on a pleading filed in the United States District Court for the District of Massachusetts by one David Turner.  Turner's motion advanced a theory that the FBI used a cooperating witness to coerce Turner to participate in a robbery, with the thought that the prospect of a lengthy prison sentence would provide him with the necessary incentive to cooperate with the investigation into the theft from the Isabella Stewart Gardner Museum on March 18, 1990.  The motion was dismissed by the District Court (Stearns, J.), and the issue of entrapment was further dismissed by the First Circuit upon appeal. *See United States v. Turner*, 2005 WL 516007 *4 (D. Mass.) (decided March 4, 2005); *aff'd*, 501 F.3d 59, 68-71 (1st Cir. 2007).

2

his due process rights. In particular, "[t]he Government's excessive involvement in the offense conduct, where the intent and object of the arrest and prosecution was to coerce and compel Defendant's cooperation in [an] unrelated matter" warrants dismissal. Def. Mem. in Support of Motion to Dismiss (dated July 2, 2012) ("Def. Mem. I") at 1-2. Gentile's virtually identical motions to dismiss were denied by Judge Chatigny, and the defendant subsequently was sentenced to a total effective sentence of 30 months of incarceration to be followed by three years of supervised release. *Gentile I-A* (Docket Entry 136) and *Gentile I-B* (Docket entry 86) (Judgments dated May 14, 2013).

Here the defendant Gentile again asserts that "the Government has engineered the instant prosecution, solely for the purpose of pressuring the Defendant into cooperating with a wholly unrelated investigation…by means of placing into his life a confidential informant wired for sound and bearing government-issued money in order to induce the defendant to commit crimes." Def. Mem. II at 1.

The defendant's motion then is founded on what has been referred to as the "outrageous government misconduct" defense that was referenced in the concurring opinion of Justice Powell in *Hampton v. United States*, 425 U.S. 484, 491-95 (1976). In essence, the defense, which has only rarely been successfully advanced by a defendant and apparently never in the Second Circuit, focuses attention on the Government's motives and methods in bringing a prosecution. *See United States v. Russell*, 411 U.S. 123, 441 (1973). In order to be successful, a "due process claim must be predicated on intolerable government conduct which goes beyond that necessary to sustain an entrapment defense." *United States v. Ianotti*, 673 F.2d 578, 606 (3d Cir. 1982) (en banc). Additionally, the conduct at issue must be "most egregious" and so repugnant and excessive as to be "shocking" to the judicial conscience." *United States v. Alexandro*, 675 F.2d

34, 40 (2d Cir. 1982).

(2) <u>Preliminary Statement</u>

In advancing his argument in support of his instant Motion to Dismiss, the defendant essentially argues that the Government caused the defendant to engage in the criminal conduct charged in Crim. No. 03:15cr67 (WWE) -- Possession of Ammunition by a Convicted Felon and Sale of a Firearm to a Convicted Felon—as a mere pretext to force him into cooperating in the Gardner Museum matter. Def. Mem. II at 1. The defense then characterizes the Government's investigation that resulted in criminal charges being brought against Gentile as "outrageous government conduct" requiring that the indictment be dismissed. The difficulty for the defense, of course, is that the technique of developing a chargeable criminal case against an individual who law enforcement officials have strong reason to believe possesses information about significant criminal activity, as a means of inducing that individual to disclose the information that he refuses to provide, is hardly a novel one or one which shocks the judicial conscience. The argument is further complicated by the fact that, despite his age, the defendant enjoys being a gangster and engaging in criminal conduct.

While the defendant asserts in his Memorandum of Law that "the Government has serially injected informants into his life" and failed to "furnish[] a good faith basis for the [firearm sale] prosecution," Def. Mem. II at 4, 10, the defendant can only make that assertion by presenting selective and, at times, inaccurate facts. As the defense knows from the discovery materials provided to it in this case, the defendant had contact with two FBI cooperators who were used in the FBI's investigation which led to the sale of the fully loaded firearm to a convicted felon (hereinafter "CW-1" and "CW-2"), and the initial contacts occurred soon after

4

the defendant's release from federal prison on April 16, 2014. *See., e.g.,* Complaint Aff. at ¶ 7.[4] The government notes that. among other things told to CW-1 after Gentile's release is the fact that Gentile had multiple firearms hidden away.  Specifically, on June 3, 2014, Gentile advised CW-1 that the FBI seized a lot of Gentile's guns, but they did not get them all. Complaint Aff. at ¶ 7.[5] Further, the instant prosecution is not the defendant's first firearms-related charge. As the defendant knows, when the FBI executed a federal search warrant at his residence on February 10, 2012, among the many items of evidence seized were multiple firearms, hundreds of rounds of ammunition, and silencers. Complaint Aff. at ¶ 5. His guilty plea to, *inter alia*, these firearms charges resulted in the sentence of imprisonment referenced above. Finally, the defense fails to mention that during one of the conversations CW-2 had with Gentile prior to his arrest in this case, Gentile told CW-2 that he (CW-2) should carry a firearm and that he (Gentile) should carry one as well, and, further, it was Gentile who first proposed the price of $1,000 per weapon. Complaint Aff. at ¶ 8.

The Government respectfully notes that, beyond the defendant's incomplete recitation of relevant facts, *the defense cites to no case law that supports dismissal of the instant indictment* even based on that incomplete description of the facts. Indeed, with respect to the defendant's basic claim that it was outrageous for the government to have lured the defendant into committing the firearms offenses for which he has been indicted as a means of fostering cooperation in another investigation, the use of a criminal actor's criminal conduct against him as an inducement for him to cooperate in other investigations of equal or greater importance

---

[4] As the government represented to the United States Magistrate Judge Thomas P. Smith at the time of the defendant's detention hearing in this case, investigators identified at least seven previously convicted felons with whom Gentile had had contact after being released on Supervised Release and prior to his arrest here, two of the seven being CW-1 and CW-2.

[5] The government notes that in theApril 17, 2015 Complaint Affidavit, this information was misakenly attributed to the cooperating individual who is denoted in this affidavit as "CW-2."

should not be shocking. In fact, the practice of using a criminal actor's knowing and voluntary criminal conduct against him to further other societal interests is not only not "outrageous," but common practice. *See Pillsbury Co. v. Conboy*, 459 U.S. 248, 290 n. 11 (1983) (referencing the "prototypical situation[]…where the prosecutor wants to induce someone who is already in prison to testify about a different conspiracy in exchange for a reduction in the existing sentence").

## II. STATEMENT OF THE LAW

To constitute a due process violation on the grounds of "outrageous government conduct," the Government's conduct, standing alone, must be "so offensive that it 'shocks the conscience.'" *United States v. Chin*, 934 F.2d 393, 398 (2d Cir. 1991) (citing *Rochin v. California*, 342 U.S. 165, 172 (1952)); *see also United States v. Romano*, 706 F.2d 370, 372 (2d Cir. 1983) (government's conduct must be "'so repugnant and excessive' as to shock the conscience" (citation omitted)). "The paradigm examples of conscience-shocking conduct are egregious invasions of individual rights." *United States v. Rahman*, 189 F.3d 88, 131 (2d Cir. 1999) (citing *Rochin*, 342 U.S. at 172 (breaking into suspect's bedroom, forcibly attempting to pull capsules from his throat, and pumping his stomach without his consent)).

As the courts of this Circuit have held, the burden is on the defendant asserting the claim to prove, by a preponderance of the evidence, that the indictments resulted from outrageous government conduct. *United States v. Cromitie*, 781 F. Supp.2d 211, 214 (S.D.N.Y. 2011) (citing *United States v. Nunez-Rios*, 622 F.2d 1093, 1098 (2d Cir. 1980)). "Especially in view of the courts' well-established deference to the Government's choice of investigatory methods, the burden of establishing outrageous investigatory conduct is very heavy." *Rahman*, 189 F.3d at

131 (citations omitted).

Finally, the Second Circuit has noted that claims of outrageous government conduct "rarely succeed[]." *United States v. LaPorta*, 46 F.3d 152, 160 (2d Cir. 1994); s*ee also United States v. Berkovich*, 168 F.3d 64, 69 (2d Cir. 1999) (courts "have almost never found such a violation" (citing *LaPorta*, 46 F.3d at 160 (finding only one case where a circuit court has found such conduct since 1976))); *United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997); *United States v. Zambrano*, 776 F.2d 1091, 1098 (2d Cir. 1985). Significantly, the Second Circuit appears never to have approved the dismissal of an indictment based on outrageous government conduct.

### III. STATEMENT OF ISSUE PRESENTED

Has the defendant Gentile met his burden of establishing by a preponderance of the evidence that the Government's actions leading to the instant indictment amount to "outrageous" conduct that was so egregious as to constitute a violation of the defendant's right to due process under the Fifth Amendment?

### IV. STATEMENT OF FACTS

In order to properly assess the defendant's "outrageous" government misconduct claim, an understanding of the details of that conduct and the context in which it occurred is necessary. To that end, the Government notes the following additional facts that were not included in the defendant Gentile's Memorandum:

(1) <u>Background of Defendant</u>

As set forth in the affidavit in support of the criminal complaint issued for the defendant Gentile's arrest on federal firearms charges, a copy of which was provided to the defendant at the time of his initial presentment, prior to his indictment in this case, the defendant resided at

69 Frances Drive, Manchester, Connecticut. Complaint Aff. at ¶¶ 5, 10. He has been the subject of numerous arrests during the course of his lifetime, including charges of Possession of Illegal Firearms, Gambling, Interstate Transportation of Stolen Goods, Larceny, Receiving Stolen Goods, and, most recently, Possession with Intent to Distribute Controlled Substances and Possession of (numerous) Firearms and Ammunition by a Convicted Felon and Possession of (numerous) Unregistered Silencers. The defendant's most recent convictions were based on a series of controlled sales of prescription drugs to a cooperator which lead to search warrant for his residence and the seizure of contraband -- including controlled substances, numerous handguns, a pistol grip shotgun, hundreds and hundreds of rounds of ammunition for handguns and long guns, a half dozen silencers, a bulletproof vest, police scanners, handcuffs and assorted other items.  Those criminal exploits resulted in the imposition of a 30-month prison sentence; a sentence which Gentile completed on April 16, 2014, at which point he started his three-year term of supervised release. Complaint Aff. at ¶¶ 5-6.

Several FBI cooperating witnesses (CWs) and an FBI undercover agent (UCA) confirm that Gentile has continuously associated with members of organized crime from various families for over 25 years. Additionally, Gentile admitted to CW-2 (the cooperating witness whose controlled firearm purchase served as the underlying conduct of the instant prosecution) and an undercover FBI Agent introduced to Gentile by CW-2 that he is in fact a made member of the Philadelphia Family of the LCN. In particular, Gentile is known to be a soldier of the Philadelphia LCN and, even more specifically, he was part of former-Philadelphia LCN capo Bobby Luisi's Boston-based crew. February 3, 2012 Search Warrant Aff. at ¶ 5. According to the FBI UCA, CWs, and Luisi's own post-arrest statements made following his arrest on federal charges in 2000 involving the distribution of multi-kilograms of cocaine, Gentile is a "soldier,"

that is, a made member, of the Philadelphia LCN.

Moreover, while conducting the instant investigation Gentile made mention of the fact that he was involved in any number of illegal activities.  For example, he discussed with CW-2 an illegal, untaxed cigarette operation being run by someone he met in prison in which he was interested in participating.  He also told CW-2 he wanted to find out the last name of the cooperating witness who had purchased prescription drugs from him (that is, the last name of the indivisual whose cooperation with the FBI led to Gentile's indictment and conviction on the drug charges and, subsequently, the firearms and silencer charges).[6]  Gentile also provided a small, sample size quantity of marijuana to the CWs and in return wanted a sample of the marijuana "Vinnie" (the undercover FBI Agent) had available for distribution.  And again, as relevant here, on June 3, 2014, he told CW-1 that while the FBI seized a lot of his guns, they had not gotten them all, and, as particularly relevant here, that he had access to and the ability to provide firearms of several types.

(2) The Stolen Gardner Museum Paintings

The defense's recitation of facts and circumstances surrounding the Gardner Museum heist and the defendant Gentile's relationship to those facts and circumstances is less than that necessary to paint a complete picture of the context in which these investigations proceeded. So, for example, in his Memorandum of Law, the defendant recites certain events regarding the defendant being subpoenaed to grand jury proceedings in Boston, his having been informed that he had been identified by "an alleged organized crime figure, since deceased, as having been the recipient of some of the stolen paintings," and his continued denial of any personal knowledge of the location of any of the paintings. Def. Mem. II at 6. The defendant fails to mention in his submission, however, a number of material facts that are relevant to a proper understanding of

---

[6] This indidivual is referred to below as "CW-3."

the context in which the events in issue unfolded. For example, his Memorandum simply refers to an "alleged [deceased] organized crime figure" without noting the person's name or his relationship to the defendant. In fact, the "alleged" organized crime figure is a reference to one Robert Guarente, a fellow member of Robert Luisi's Boston-based crew of the Philadelphia LCN Family and a close associate of Gentile. In this regard, based on an interview conducted by the FBI with Luisi back in 2000, Luisi identified both Gentile and Guarente as individuals that he "made," that is, inducted into the LCN, and who were closely connected to one another.

Further, the defendant fails to mention that he was fully aware of the fact that investigators knew he had lied about a number of things in his interviews, interviews that occurred prior to the pending indictment being returned.

Moreover, while the defendant's Memorandum correctly stated that "Mr. Gentile denied having any personal knowledge as to the location of the paintings, or who might have them," and "has maintained this position to date," Def. Mem. II at 6, the defendant fails to note that defense counsel asked if the Government would be willing to afford the defendant an opportunity to be polygraphed on his knowledge of matters relevant to the Gardner robbery and that that request was accommodated. In particular, the defendant was polygraphed by a highly regarded professional. The expert had been a polygrapher for the FBI for many years prior to his retirement, and his services are now utilized by various law enforcement agencies, national intelligence agencies, and numerous members of the defense bar. When the defendant was polygraphed on the Gardner matter, he was tested on three relevant questions, namely:

    A.  Did you know those paintings would be stolen before it happened?
          Answer: No

    B.  Did you ever have any of those stolen paintings in your possession?
          Answer: No

C.  Do you know the current location of any of those paintings?
           Answer: No

The results of the polygraph establish without question that the defendant was not being truthful in his answers to any of the relevant questions, a fact made known to the defendant and his counsel at the time the tests were run. Indeed, the probability of his answers being truthful was calculated at <0.1%, and, utilizing a second scoring system for comparison purposes, the probability of his answers being deceptive was calculated at >99%.

Moreover, the defendant fails to mention that when Agents executed the federal search warrant at his residence on February 10, 2012, they found and seized a copy of the *Boston Herald* from the day after the Gardner heist which reported the theft on its front page—an event that, again, had occurred more than twenty years earlier on March 18, 1990. Inside the seized copy of the newspaper was a hand-written list of the items stolen, along with corresponding dollar values for each item.

The defendant's recitation of facts regarding the nature of his contacts with a third cooperating individual, CW-3, is also less than complete. So, for example, as far back as 2008, when CW-3 was assisting with the FBI in collecting information on organized crime activities in the Hartford area, it was reported that Gentile was meeting regularly in a car lot in Hartford, which at the time CW-3 believed was owned by Tony Volpe. CW-3 identified Gentile as a Philadelphia and Boston organized crime associate.[7] Further, when asked about Gentile at a later point in time (March 26, 2010), CW-3 advised Agents that he was first introduced to Gentile in 2007 by Volpe, with whom CW-3 was friendly and with whom he had served time in the past. Gentile had told CW-3 that he was "with people in Boston," meaning organized crime figures. Moreover, Gentile told CW-3 that he was with Bobby Luisi in Boston and Luisi was with, and

---

[7] A copy of the relevant report was provided to the defense in discovery in the 2012 case (No. 3:12cr34 (RNC)).

supervised by, the Philadelphia LCN.[8]

As reflected in other discovery materials provided to the defense in these matters, in April of 2010, the FBI tasked CW-3 to go see Gentile and engage him in general conversation. The CW was directed to pay particular attention to anything Gentile might say about the Gardner Museum theft, but not to initiate any conversation on that topic. As reported to the FBI—and to the defense by way of Rule 16 disclosures—the defendant in fact told the CW about the FBI approaching him on the robbery, how one of Gentile's old crew members, who had "masterminded the whole thing," had "flipped" before he died (in context a clear reference to Robert Guarente), and that the FBI had offered Gentile a $5,000,000 reward and immunity for information about the robbery. The CW reported that when he asked Gentile if he had the paintings, Gentile "just smiled." Thus, investigators concluded that the defendant had perjured himself before the grand jury in Boston in December 2010 and terminated his "cooperation" in the early part of 2011.

(3) <u>Investigation Re Defendant's Possession of Ammunition and Sale of a Firearm to a Convicted Felon</u>

Almost immediately upon his release from federal prison on April 16, 2014, Gentile began having contact with CW-1 and CW-2, both of whom are convicted felons. Gentile advised CW-1 on June 3, 2014 that he had firearms hidden away that the FBI had failed to seize. It was only then that investigators decided to initiate the instant investigation. Based on the facts and circumstances set forth below, where CW-2 simply asked the defendant if he would sell the CW a firearm and the defendant said he would—and then in fact did sell him a firearm—it becomes something of a head scratcher as to how the Government's involvement in the offense

---

[8] This information was also provided to the defense in discovery in the 2012 case.

conduct could be deemed "excessive" and/or violated the defendant's due process rights. *See* Def. Mem. II at 1.

    a.  <u>February 2015 Meetings with CW-2</u>

On February 22, 2015, CW-2 met with Gentile under FBI direction and told Gentile that he needed a firearm because he (CW-2) was owed a debt from a drug transaction and the debtor was refusing to pay. Gentile stated that CW-2 should carry a firearm and stated that he (Gentile) should carry one as well. Gentile advised CW-2 that he knew of an individual who could provide each of them with firearms and that the cost would be $1,000 for each weapon.  CW-2 agreed to the price. Gentile advised CW-2 that it would take a couple of days in order for him to acquire the firearms. Complaint Aff. at ¶ 8.

On February 27, 2015, CW-2 again met with Gentile under FBI direction to hold discussions in furtherance of the proposed firearm transaction. Gentile advised CW-2 that the individual who had the firearms for sale did not feel comfortable traveling with the weapons during the week and, therefore, Gentile would be meeting with this individual over the upcoming weekend to procure the firearms. Gentile told CW-2 that he would call CW-2 over the weekend, and added that if he asked CW-2 the question, "Have you spoken with your cousin?" that would mean that Gentile had been successful in obtaining a firearm for CW-2.  The plan then would be to meet on Monday, March 2, 2015 to complete the gun sale. Complaint Aff. at ¶ 9.

    b.  <u>March 2015 Controlled Firearm Purchase</u>

On March 1, 2015, Gentile unexpectedly called CW-2 in the early evening and held an unrecorded conversation, during which Gentile, using cryptic language, instructed CW-2 to immediately drive to Gentile's house to pick up the gun. Gentile said that he did not want to

have the gun in his house for an extended period of time. Complaint Aff. at ¶ 10. According to CW-2, Gentile was being very impatient when he told CW-2 to get the gun out of his house. CW-2 immediately called FBI Special Agent James Lawton, who is a co-case agent in the instant investigation. *Id.* Agent Lawton and CW-2 discussed the fact that at the time, there were blizzard-like conditions outside and that the gun purchase had to take place with a full cover team in place due to the dangerousness of the transaction and the investigative necessity of having enough personnel to cover CW-2 when the transaction took place. Agent Lawton told CW-2 to tell Gentile that due to CW-2's health condition and the blizzard-like weather outside, the gun buy would have to take place the next morning. CW-2 called Gentile and then called SA Lawton back and reported that Gentile was angry, but agreed to meet with CW-2 the next morning at Gentile's Frances Drive residence. *Id.*

On March 2, 2015, CW-2 met with Gentile at Gentile's Frances Drive residence in Manchester, Connecticut for the purpose of purchasing the firearm for the previously agreed upon price of $1,000. Complaint Aff. at ¶ 11. Prior to this meeting, CW-2's person and vehicle were thoroughly searched by FBI personnel for drugs, weapons or other contraband; none were found. CW-2 was then provided with recording equipment and $1,000 in government funds. *Id.* CW-2 drove to Gentile's residence while continuously being observed by an FBI surveillance team. The surveillance team maintained surveillance of CW-2 all the way to Gentile's house, when he entered the house, when he walked out of the house, and then all the way to a predetermined location where CW-2 met up with the agents. *Id.*

CW-2 advised investigators, as corroborated by the consensual recording CW-2 made using FBI recording equipment, that when he entered the Gentile residence, Gentile brought him into a small room near the foyer. Complaint Aff. at ¶ 12. Gentile then unzipped a couch cushion

and produced a handgun, which was contained in a blue cloth that had been secreted inside the couch cushion. The CW-2 counted out $1,000 in U.S. currency and handed the money to Gentile.  Gentile then provided the blue cloth with the gun inside to CW-2. After purchasing the firearm, CW-2 left Gentile's residence. *Id.* After leaving 69 Frances Drive, CW-1 was surveilled continuously until he made physical contact with the investigators at the predetermined location, at which point they took possession of the handgun and recording equipment from CW-2. Complaint Aff. at ¶ 13. The handgun was determined to be a .38 Colt Cobra revolver, serial number M54544, loaded with six (6) rounds of Smith & Wesson .38 special ammunition. *Id.*

Investigating case-agent, FBI Special Agent Geoffrey J. Kelly, averred that the Smith & Wesson ammunition sold by Gentile to CW-2, having been manufactured outside the State of Connecticut, necessarily had to have traveled in interstate commerce. Complaint Aff. at ¶ 14. He further indicated that both Gentile and CW-2 are convicted felons. *Id.* The above recited facts clearly furnished probable cause to believe that Robert Gentile had violated 18 U.S.C. §§ 922(g)(1) (prohibiting possession of ammunition by a convicted felon) and 922(d)(1) (prohibiting sale of a firearm to a convicted felon).


**V. ARGUMENT**

The defendant has moved to dismiss the indictment pending against him on the grounds that the Government engaged in "outrageous" conduct in violation of due process under the Fifth Amendment. Specifically, the defendant claims that the Government "engineered the instant prosecution" designed to "pressur[e] the Defendant into cooperating with a wholly unrelated investigation." Def. Mem. II at 1. The fact that the Government is interested in information the defendant possesses regarding a separate investigation, however, does not *ipso*

*facto* mean that the Government's investigation that led to the instant indictment amounts to "outrageous government conduct." In point of fact, the Government's investigation in the present case does not even remotely approach outrageous government conduct. "Ordinarily such official misconduct must involve either coercion … or violation of the defendant's person." *Schmidt*, 105 F.3d at 91 (citations omitted); *see also United States v. Myers*, 692 F.2d 823, 837 (2d Cir. 1982) ("the due process claim, in the rare instances when successful, has prevailed to restrain law enforcement activities that involve coercion … or outrageous violation of [a defendant's] physical integrity").

The defendant Gentile alleges that the Government engaged in two forms of conduct that warrant this Court's dismissal of the indictments: first, "psychological and physical coercion," citing *Chin*, 934 F.2d at 399 n. 4; and second, "engineering and directing the criminal enterprise that it is prosecuting from start to finish," citing *United States v. Heyward*, No. 10cr84 (LTS), 2010 WL 4484642, at *2 (S.D.N.Y. 2010). Def. Mem. II at 13. Both claims are meritless.

(1) <u>Psychological and Physical Coercion Claim</u>

The defendant first appears to allege that the Government's investigation amounted to physical coercion. Specifically, the defendant cites *Chin* to support his claim that the Government's conduct constituted coercion because "Mr. Gentile faces worsening illness and death in jail if he does not cooperate with the Government in an unrelated case, and the entire goal of the purported firearms transaction investigation was to compel this result." Def. Mem. II at 17. However, the defendant's reliance on *Chin* is misplaced. The examples of physical coercion referenced by the Second Circuit in *Chin* establish an extremely high standard for what constitutes outrageous government conduct: in *Rochin*, 342 U.S. at 172, "police officers broke into defendant's bedroom, attempted to pull drug capsules from his throat, and, finally, forcibly

pumped his stomach to retrieve the capsules"; in *Huguez v. United States*, 406 F.2d 366, 381-82 (9th Cir. 1968), "border patrol officers forcibly removed narcotics packets from defendant's rectum while defendant was handcuffed and held spreadeagled across the table by other officers." *Chin*, 934 F.2d at 398-99. By contrast here, even if the Government sought to obtain information from the defendant by indicting him for his engagement in criminal conduct, this does not constitute "[e]xtreme physical coercion" causing the type of "'brutal'" injuries described by the Second Circuit in *Chin*. *Id.* The mere fact that the defendant faces a term of imprisonment if convicted does not come close to approaching the egregious bodily invasions cited by the Second Circuit in *Chin* as instances of physical coercion constituting outrageous government conduct.

Nor did the government's conduct constitute "psychological torture [which] rises to the level of outrageousness" as elaborated by the Second Circuit in *Chin*, *id.* at 399 n. 4. In *Chin*, the Second Circuit cited to a paradigm "psychological coercion" case, where the defendant was held without access to counsel or advisement of his rights, placed in solitary in a cell with no bed or chair, interrogated by teams of police long into the night, and subjected to this treatment for a week. *Watts v. Indiana*, 338 U.S. 49, 53 (1949) ("when a suspect speaks because he is overborne, it is immaterial whether he has been subjected to a physical or a mental ordeal"). By way of contrast, the Second Circuit further cited to an investigation—which also stemmed from an effort to recover stolen art—that did not amount to psychological coercion. In *United States v. Kelly*, 707 F.2d 1460, 1461 (D.C. Cir. 1983), FBI agents engendered "an elaborate hoax…to ferret out corrupt public officials" by offering $25,000 to defendant congressman in exchange for assistance in becoming permanent residents of the United States. Despite calling the transaction "an unwholesome spectacle," *id.* at 1477 (internal quotation marks omitted), the

D.C. Circuit Court held that "[t]he importuning of Congressman Kelly and the offers made to him, extraordinary and in excess of real-world opportunities as they appear to have been, did not involve the infliction of pain or physical or psychological coercion. We are therefore constrained to reverse." *Id.* Not only is the inducement of a simple firearms sale in the present case far below the level of psychological coercion the defendant underwent in *Watts*, but it also likely falls below the level of coercion exerted in *Kelly*. Whereas Kelly was repeatedly offered $25,000 during multiple conversations that took place across four months, Gentile was only propositioned once and offered $1,000—a price he himself proposed—by his longstanding acquaintance, in exchange for firearms over which the defendant had earlier indicated that he had access.

(2) <u>Engineering and Directing Transaction Claim</u>

The defendant's second claim, that "the Government engineered and directed the purported firearms transaction from beginning to end," Def. Mem. II at 17, is also without merit. There is no evidence relating to the controlled purchase of a firearm and ammunition from defendant that suggests the defendant was anything other than a predisposed, eager, ready-to-make-a-buck purveyor of the firearm. Indeed, there is no evidence of some type of long-standing, familial or other such relationship between the defendant and CW-2. Rather, this was a relationship between what Gentile believed to be a fellow criminal engaging in criminal commerce to make some money. The fact that law enforcement agents took advantage of the defendant's avarice hardly constitutes "outrageous government conduct." The Government respectfully notes that the Second Circuit has held that "extensive government involvement in criminal activity, without more, does not constitute the type of coercive action … or outrageous violation of physical integrity … or other egregious or outrageous government conduct rising to

18

the level of a due process violation." *United States v. Dyman*, 739 F.2d 762, 769 (2d Cir. 1984)

(citations omitted). In *Schmidt*, for example, the Second Circuit rejected the defendant's due

process claim even as it "recognize[d] the government's involvement in Schmidt's plan was

extensive." 105 F.3d at 92. There, the defendant argued that "[h]ad the government not launched

its sting operation … she would have simply remained in the mental observation unit" rather

than planning to murder two federal agents and escape from custody. *Id.* Despite these

assertions, the Second Circuit found that the Government's conduct did not "reach[] a

demonstrable level of government outrageousness" constituting a due process violation, noting

that "there are occasions when the government is required to appear to participate in a criminal

conspiracy in order to gather evidence of illegal conduct, … or, as here, to prevent it." *Id.* Under

Second Circuit law, then, the Government's alleged "over-involvement" in the charged crimes is

not a legally cognizable basis for a claim of outrageous government conduct.

The sole case cited by the defendant Gentile in support of his claim is *United States v.

Heyward*, No. 10 Cr. 84, 2010 WL 4484642 (S.D.N.Y. 2010), an *unreported* district court case

that in turn discusses case law from outside the Second Circuit. *See Heyward*, 2010 WL

4484642, at *4. The defendant relies heavily on *Heyward* for his claim that the Government

"engineered and directed" the charged crimes. *See* Def. Mem. II at 17. However, even the

district court in Heyward rejected the defendant's due process claim as having neither a legal

nor factual basis for a finding of outrageous government conduct. *Heyward*, 2010 WL 4484642,

at *4. Significantly, the district court noted that:

> The Second Circuit has held that government initiation of and inducement of a
> defendant to commit a crime, even if the circumstances involve both supplying
> contraband to and purchasing contraband from a defendant, does not establish
> government over-involvement in a criminal offense such that due process is
> violated. … The Second Circuit's rejection of the initiation of illegal transactions
> and supplying of materials as sufficient to warrant the dismissal of indictments on

due process grounds casts doubt on whether the Informant's alleged conduct, even if attributed to the government, could be sufficient to sustain Defendant's burden here.

*Id.* at *3-4.

Given the district court's observation in *Heyward* that under Second Circuit law, "government initiation … and inducement of a defendant to commit a crime … does not establish government over-involvement in a criminal offense such that due process is violated," *id.*, Gentile's reliance on *Heyward* is misplaced.

(3) Defendant's Reliance on *Merlino* is Misplaced

After positing his two theories of physical/psychological coercion and engineering/directing the transaction, the defendant proceeds to draw heavily from a Massachusetts case which also arose from the Gardner Museum investigation, arguing that this was an instance with very similar facts where "a Government investigation may have blended coercive intent and purpose with a Government-engineered crime." Def. Mem. II at 18. However, defendant misinterprets and gives undue weight to the decision in *United States v. Merlino*, No. CRIM. 99-10098-RGS, 2000 WL 294880 (D. Mass. Mar. 10, 2000).

As a preliminary matter, the government notes that (1) notwithstanding the mutual connection to the Gardner Museum investigation, this Court is not bound by the decision of the District Court of Massachusetts; and (2) the sole relief quoted in *Merlino* was to allow an evidentiary hearing on outrageous government conduct, and not to dismiss the indictment or find a due process violation. Indeed, subsequent history shows that the trial court (Stearns, J.) ultimately denied the defendants' motion and instead allowed the defendants to pursue an entrapment defense; entrapment was ultimately how the issue was presented at trial, without success for the defendants. *United States v. Merlino*, 523 F. Supp.2d 66, 68 n. 6 (D. Mass. 2007)

("At the close of the evidentiary hearing, the court indicated that 'I am not so sure now that the issue is outrageous government misconduct…there is only one recorded case in all of the appellate history where an indictment was dismissed for outrageous government misconduct.'").

Furthermore, the order granting an evidentiary hearing only stated that "proof that the government manufactured the crime out of whole cloth, not for purposes of exposing and prosecuting a dangerous criminal, but to pressure him into becoming a Government informant, might *arguably* be shocking enough to the judicial conscience to warrant the extreme sanction of dismissal of the resulting indictment." *Merlino*, 2000 WL 294880 at *2 (emphasis supplied). The court immediately went on to indicate that the defendant "is not, however, entitled to an evidentiary hearing as a matter of course." *Id.* Despite the equivocation in this language, indicative of the trial court merely establishing an argumentative premise, the defendant draws the unwarranted conclusion that *Merlino* issued a "preliminary finding that the Government's manufacture of a crime out of whole cloth in order to pressure the defendants to cooperate *would* shock the conscience," and urges this Court to apply the finding to the instant facts. Def. Mem. II at 19. In doing so, defendant omits certain of Judge Stearns' more unequivocal statements: "Let me stress, however, that I agree that the fact that the government creates a crime is insufficient 'without a lot more' to make out a due process violation." *Id.* at *2 n. 4. Finally, defendant fails to note the trial court's emphasis that "[e]ven if all of these questions were to be resolved in defendants' favor, it does not ineluctably follow that a violation of due process occurred." *Id.* at *3 n. 6. Simply put, *Merlino*'s subsequent history, as well as its actual language, does not add up to the kind of support necessary that shold persuade this Court that Gentile's indictment should be dismissed.

*       *       *

21

Thus, both of the defendant's theories fail, and his reliance on the trial court's decision in *Merlino* is misplaced. He has therefore not established by a preponderance of the evidence any misconduct on the part of the government investigators, to say nothing of outrageous government conduct warranting dismissal of the indictment.

## VI. CONCLUSION

For the reasons set forth above, this case does not present facts that support the defendant's contentions. Accordingly, the Government respectfully submits that the motion should be denied, with the defendant being free to pursue an affirmative defense of entrapment at trial where he can fully explore the conduct of the investigators in this matter. The triers of fact can then decide whether the Government made up the firearm transaction charged against the defendant out of whole cloth as he alleges, and whether the defendant was predisposed to engage in the criminal conduct alleged or, on the other hand, if his will was overborne by Government overreaching.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

/s/ John H. Durham

JOHN H. DURHAM
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct05087
157 Church Street, 23rd Floor
New Haven, CT 06510
(203) 821-3700

C E R T I F I C A T I O N

I hereby certify that on August 11, 2015, the foregoing Government's Motion for Extension of Time to Respond to Defendant's Motion to Dismiss was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.

/s/ John H. Durham
_____
JOHN H. DURHAM
ASSISTANT U.S. ATTORNEY