UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - x
                              :
UNITED STATES OF AMERICA      :  No.  3:15CR00067(RNC)
                              :
          vs.                 :
                              :
ROBERT GENTILE                :
                              :  HARTFORD, CONNECTICUT
              Defendant       :  January 6, 2016
                              :
- - - - - - - - - - - - - - - x
```

MOTION HEARING


BEFORE:

HON. ROBERT N. CHATIGNY, U.S.D.J.



APPEARANCES:


FOR THE GOVERNMENT:

OFFICE OF THE UNITED STATES ATTORNEY
157 Church Street, 23rd Floor
New Haven, Connecticut 06510
BY:  JOHN H. DURHAM, AUSA

FOR THE DEFENDANT:

ROME McGUIGAN, P.C.
One State Street
Hartford, Connecticut 06103
BY:  RYAN MCGUIGAN, ESQ.
     THOMAS PLOTKIN, ESQ.



Darlene A. Warner, RDR-CRR
Official Court Reporter

1                          2:13 P.M.

2

3              THE COURT:  Good afternoon.  This is a hearing

4     on the pending motion to dismiss.  Would you please state

5     your appearances.

6              MR. McGUIGAN:  Attorney Austin Ryan McGuigan for

7     the defendant, Your Honor, who is at my right, Mr. Robert

8     Gentile.  Also at my right is co-counsel Thomas Plotkin

9     who I believe is admitted before the Court.

10             MR. PLOTKIN:  I am.

11             THE COURT:  Thank you.

12             MR. DURHAM:  And John Durham for the United

13    States, Your Honor.

14             At counsel table with me is Special Agent Geoff

15    Kelly of the FBI, Special Agent James Lawton of the FBI,

16    and paralegal United States Attorney's Office Kori

17    Arsenault.

18             THE COURT:  Thank you.

19             The defendant's motion asks me to dismiss the

20    indictment based on a violation of his right to due

21    process.  He relies on a claim of outrageous government

22    conduct.  I think that the best way to proceed is to first

23    give counsel an opportunity to comment on the nature of

24    this claim so that I have a clear understanding, and then

25    we can talk about how we should proceed from there.

1          In preparation for today, I have read your

2     papers and looked at the law on this type of claim; and

3     having done that, I understand that claims of this nature

4     almost never succeed.  In some circuits, the Sixth and

5     Seventh, to be exact, the claim isn't recognized as a

6     permissible one, and in those circuits that allow for the

7     possibility that such a claim could warrant dismissal of

8     an indictment, I believe only one circuit has actually

9     affirmed a dismissal, and since then that circuit has

10    questioned the validity of its own precedent.

11          I say that because I think it's important to

12    realize that what Mr. Gentile is looking for here is truly

13    extraordinary and can be granted, if at all, only for

14    sufficient cause.

15          So, Mr. McGuigan, let me begin by asking you to

16    please explain as precisely as you can the claim that you

17    are making.

18          MR. McGUIGAN:  Thank you very much, Your Honor.

19          It's deja vu all over again.  Here we are again

20    with Mr. Gentile before this Court with.  As Your Honor

21    knows, you sentenced him before in the first case that he

22    had and he pled guilty in that case and I believe, Your

23    Honor, he was given a fair sentence.

24          Almost -- well, and because of that or in spite

25    of that, or as it might have just sort of happened, the

1      paintings of the Isabella Stewart Gardner Museum were

2      never returned, they were never found, there was no

3      information that was forthcoming.

4              It was our belief in the first case, and we had

5      brought it up before the Court in another motion to

6      dismiss on the same exact grounds which we withdrew as

7      Your Honor remembers that made essentially the same claim,

8      that the government's interest in the defendant is not

9      based on either his potential for danger to the community

10     or for any criminal activity that he had previously done,

11     which is what a proper law enforcement function would be,

12     constitutional law enforcement function.

13             In this particular case, you have government

14     agents working under what jurisdiction I can't really

15     figure out.  There is federal jurisdiction for thefts from

16     museums, there's federal jurisdiction for property -- for

17     stolen property crossing state lines, but the statute of

18     limitations has run on both of those.  So it seems as

19     though the federal government is working at the behest of

20     a private museum in Massachusetts.

21             And they have injected themselves into the life

22     of my client not because again he is a danger to the

23     community.  I've read the 302's that they've provided to

24     me about him.  And they are ancient history.

25             He seems to be, whatever they claim his

1    association is, he seems to be a retired old man living in

2    Manchester in a three-bedroom ranch with a carpet so old

3    that it buckles in the middle and there are tracks going

4    from the front door into the kitchen and down the hallway

5    because it hasn't been replaced since probably the house

6    was first built.  In other words, he certainly isn't a man

7    of means; he certainly doesn't have a 401(k); he certainly

8    doesn't have any money outside of the Social Security

9    benefit.

10          In many of the Court filings from the government

11   you see sentences written in the passive voice, such as,

12   my client had contact with CI's, with cooperating

13   witnesses, with government agents, when in fact the direct

14   truth is is that the government injected those people into

15   my client's life.  My client was on supervised release and

16   he was living a quiet life.

17          The government put two convicted felons into his

18   life, not the other way around, by sending them to his

19   house with the express purpose of, well, that's the thing,

20   at this point I don't know.

21          The discovery that I have been given begins on

22   June 3, 2014.  The problem that I have right now with Your

23   Honor is that I am claiming that the government's conduct

24   was excessive.  I'm asking for a dismissal of this case

25   based on its outrageousness.

1        But I don't even know the totality of the

2  conduct because I am not privy, according to the

3  government, to discovery on all of the interactions

4  between these two government agents and my client.

5        It is my client's contention that if he did

6  commit a crime, that he was cajoled to do it by the two

7  government agents whose primary modus operandi was not to

8  get my client to commit a crime, their primary duty was to

9  get information about paintings from the Isabella Stewart

10  Gardner Museum.

11        The majority of the disclosure I guess or

12  information that I have before me, Your Honor, doesn't

13  come from the government, it comes from the Hartford

14  Courant.  I had to get most of it from the front page of

15  Sunday's Courant.

16        I had asked the government several months ago to

17  disclose the names of the individuals who were the agents

18  who the government injected into my client's life to

19  cajole him to commit a crime.  They made me sign, which I

20  did, they asked me to sign a non-disclosure, which I

21  wouldn't give the names to any people in the public.  I

22  signed that.  I still was not given the names of the

23  individuals so that I could subpoena them for today's

24  motion to dismiss.  I now find out who these people are

25  from the Hartford Courant.

1        So as we stand here today, I have before Your

2   Honor a discovery motion that I would like Your Honor to

3   act on to compel the government to give me the

4   information, the discovery, that I believe I'm entitled

5   to.

6        Because right now, what they're asking me to do

7   in this motion to dismiss, which as Your Honor says is

8   granted once by the Third Circuit in the Twigg case, I do

9   know the odds that I'm up against, but I would like to

10   have a fair fight.  Right now, the government is asking me

11   to fight in the dark, which compounds my belief that their

12   actions are outrageous.  I should at least be given any

13   and all information with regards to the contacts that

14   their agents had, the two confidential informants, and

15   apparently there was an FBI agent as well, who contacted

16   my client.

17        There is a hiatus of disclosure from June the

18   3rd of 2014 to February the 7th of 2015, but there were

19   contacts, numerous contacts, between the government

20   agents, my client -- by the government agents, I don't

21   mean the ones sitting on my left.  I mean the confidential

22   informants.  I don't know what their relationship with the

23   government is because I don't have their -- I don't have

24   any agreements.  They haven't been disclosed.  So I don't

25   know what their agency is with the government.  So I just

1   use the term loosely.

2        But with those individuals, including a

3   undercover FBI agent that I only know as Nick, I have

4   disclosure from February the 7, 8, 22, 23, 27 and then

5   there's the disclosure from the day of the instant offense

6   which is March 2.

7        What I don't have is the full disclosure of all

8   of the contacts which I believe that I am entitled to.

9   The hearing on the motion to dismiss -- what I do have

10  before me is the government, they have a very nice

11  paralegal and she was here 1:00, like us, and she gave us

12  all kinds of paperwork that has been premarked as

13  government's exhibits, and I have, I guess -- I made a

14  joke that I have some discovery now.

15       All of this purports to be a defense to -- an

16  entrapment defense; it is purporting to show

17  predisposition.  That's not what this case is about.

18       The government wants to say, and they have

19  before, that my client probably did have something to do

20  with -- or does have some knowledge about the whereabouts

21  of the paintings and therefore you should turn a blind eye

22  to what they did.  My client has a criminal record and

23  therefore you should turn a blind eye to what they did.

24       They would like the focus of this hearing to be

25  on my client's life and his predisposition as opposed to

1     what this hearing should be, which is a focus on the

2     government's conduct.

3              When I was a prosecutor, unfortunately I heard

4     many prosecutors say this that:  Well, we might have got

5     you bad this time, but it just serves you right for all

6     the things we didn't catch you doing; and that to me was

7     fairly outrageous.

8              THE COURT:  So the claim is that the government

9     violated due process by injecting people into your

10    client's life, as you put it, to induce him to commit a

11    crime?

12             MR. McGUIGAN:  Well, it would be -- the

13    outrageousness is based on the -- well, at this point,

14    Your Honor, the outrageousness is based on what my client

15    has been telling me in terms of what these two agents

16    actually tried to cajole him with, which is many different

17    offers to commit many different crimes that he rejected.

18             He is a 79 year old man in poor health.  The

19    claim is that in this particular set of circumstances, to

20    be trying to leverage a death of prison to get information

21    about missing property is in itself outrageous conduct.

22    Because the case in and of itself is not outrageous; but

23    the outrageousness of the conduct, again, Your Honor, I

24    don't know the totality of the conduct because they have

25    not shown me what it was that they actually did in this

1    second investigation.  I have limited the scope of my

2    motion to just sort of the bookends of when he was

3    released from prison to the arrest on the immediate case.

4          The government has pictures going back to the

5    2012 arrest.  I haven't even spoken about that arrest.

6    What I'm particularly focused on is an elderly man who's

7    sitting at home on supervised release minding his own

8    business and the government -- how many cases do we have

9    where the government is injecting themselves into the life

10   of a 79 year old retired man whose sickly?  Why would they

11   be doing that unless it is for some other reason?

12         They would like to catch him, they would like to

13   cajole him, they would like to overbear his will and get

14   him to commit a crime because they can't jail him for the

15   thing that they would like to, which is the possession of

16   paintings that he apparently doesn't have.

17         I don't even know if they believe that anymore.

18   I know, I've been reading the papers, I get them, and I

19   know they were in Suffolk Downs in September digging

20   through horse paddocks looking for paintings.  I asked my

21   client if he'd ever been to Suffolk Downs and he'd never

22   even been there in his whole life.

23         So I don't even know if they're interested

24   anymore, but I would assume they are because they found

25   nothing at Suffolk Downs.

1          THE COURT:  I realize you want to be able to

2     develop a record regarding the full totality of the

3     circumstances.

4          MR. McGUIGAN:  Full totality of circumstances.

5          THE COURT:  And I understand you don't want to

6     be confined in any way, but please bear with me.  I need

7     to understand whether there is a sufficient basis here for

8     the Court to permit discovery or an evidentiary hearing,

9     and in that regard I think it's necessary for me to have a

10    clear understanding of what you are claiming.

11         Based on what you have said in your papers and

12    today, I understand you to be claiming that Mr. Gentile as

13    a person on supervised release had a right not to be

14    targeted by the government.  It's unclear whether a

15    perfectly innocent person minding his own business has a

16    due process right not to be targeted by the government.

17         Putting that aside, your claim, as I understand

18    it, is that the government undertook to target Mr. Gentile

19    to induce him to commit an offense so they could threaten

20    him with what amounts to life imprisonment if he failed to

21    do what they wanted him to do.

22         Can you be more specific with regard to that

23    aspect of it?

24         They wanted to be able to threaten him with life

25    imprisonment unless he did what?

1          MR. McGUIGAN:  What they would -- the

2     outrageousness claim, Your Honor, not only has to do with

3     the target and the right that he has, but also it -- it's

4     the -- I believe that the nature of the doctrine is

5     prophylactic and I believe it's punitive in nature, much

6     like the fruit of the poisonous tree.  I think that it is

7     designed to punish an overreaching government.  And some

8     of the language from some of the courts have to talk about

9     the government's over-involvement in the offense conduct.

10          In the Twigg case, the specifics of the case, it

11     was about a meth lab, and the precursor for the

12     methamphetamine was provided by the government.  The money

13     that was needed to purchase some of the bottles and

14     whatnot, all provided by the government.  And it was the

15     Court's decision that the -- essentially the government

16     had created the whole criminal activity out of whole

17     cloth.

18          THE COURT:  But this case is different.

19          MR. McGUIGAN:  No, I think it's exactly the same

20     and that is why I'm looking for a broad discovery, but

21     it's not really broad.  It literally has to do with they

22     provided me with June 3, 2014 to March 2, 2015.  But they

23     stopped the disclosure from June the 3rd until February

24     the 7th.  And I'll tell you why, and this is the most

25     important thing:  That the government created a fictitious

1    drug deal with these two agents that was a complete and

2    utter farce.

3            According to, again not the disclosure I've been

4    given, but according to the newspaper article, these two

5    agents were provided with approximately $100,000 worth of

6    government money, from what I've read -- but again I don't

7    know that because I haven't gotten any discovery which is

8    one of the things I'm particularly interested in, is how

9    much money they paid to this gentleman who I believe were

10   then supposed to give it to my client to sort of ply him

11   with money and tell him that they were part of some big

12   drug transaction that was going on, and he was getting his

13   tribute; which would be nice if it were true, but

14   according to my client is not.

15           Him being an older man, being a lonely man, he

16   hung around with these two guys because they treated him

17   like he was a somebody, they treated him like I guess he

18   was some sort of royalty.

19           The importance of the discovery is to see what

20   happened between the introduction in June and see what

21   went wrong, because it is our belief that the government

22   was trying to leverage information about the paintings in

23   return for this flow of money from this fictitious drug

24   dealer from Arizona or Mexico or where ever it was that

25   supposedly was going to my client.

1    I believe the nefarious part of it is that they

2    then parlay the drug paintings and they tell my client,

3    well, we got a problem.  The guy who is the source of the

4    payments, the guy who is the source of the funds now says

5    he's interested in these paintings because he heard that

6    you might have some of these paintings because he reads

7    the papers.

8    I would like to know how that developed.  I

9    would like to know where that rabbit went down that hole,

10   and I'd like to follow it, and I'd like to see what

11   exculpatory evidence it brings, because I don't know what

12   is out there, because again, I'm fighting in the dark

13   here.

14   But it is my belief that the two agents giving

15   my client money, then come up with this problem that the

16   drug money source guy who wants the paintings is not going

17   to give us anymore money, not going to do anymore deals

18   with us, unless you sell him the paintings.

19   So now it's gone from:  Well, you might want to

20   sell a painting to the guy to, well, if you don't, we're

21   out of business.  And this is all fiction, by the way.

22   It's all created by the government.  It's all a lie.

23   And then it's our belief -- again, I don't have

24   any discovery, that's why I want it -- that my client, it

25   seems from the newspaper article, drives around and it

1    would look to -- look like to someone who is looking from

2    the outside that he was setting up an actual real

3    transaction.  But the other way to look at it is he's just

4    pretending so this fictitious drug source continues to do

5    business with his friends.

6            But then it gets even more nefarious, wherein

7    after my client fails to deliver any paintings, because he

8    doesn't have any, fails to deliver any information about

9    the paintings, again because he doesn't have any, they

10   then send -- the government, they then send the two

11   agents, or I believe the one agent, Mr. Bowes, who is now

12   deceased, and Mr. Bowes informs -- and I do have those

13   transcripts -- Mr. Bowes informs my client that they're

14   going to kill him.

15           He then -- and these transcripts will -- there

16   will be an issue about these, Your Honor -- but there are

17   communications where Mr. Bowes is saying that the Mexican

18   drug connection whose deal has now been screwed up by my

19   client's refusal to give the paintings up, they're now

20   threatening Mr. Bowes' life.  And then it is my belief

21   that Mr. Bowes then cajoles an old man to sell him a gun.

22           And that's the totality of the government's

23   case.

24           THE COURT:  So --

25           MR. McGUIGAN:  I don't know this because I don't

1    have the discovery on it.  But it is my belief.

2            THE COURT:   -- you're --

3            MR. McGUIGAN:  I believe it would be improper

4    for them, and I believe it's improper and outrageous

5    itself to target somebody in his home about a crime that

6    the government can no longer prosecute.  I believe it

7    would be improper to do that by creating some sort of a

8    fictitious criminal enterprise for him to join.

9            I then find it particularly outrageous that they

10   then, after it doesn't get them the fruit that they want,

11   which is to return the paintings -- because again my

12   client doesn't have any -- they then flip the whole thing

13   on them and tell him the two people he's working with,

14   their lives are now in danger and it's your fault.

15           THE COURT:  And it's your claim that Mr. Gentile

16   was induced to sell the firearm on the ground that this

17   was necessary to avoid a risk of death to --

18           MR. McGUIGAN:  Mr. Bowes.

19           THE COURT:  -- one of the CW's?

20           MR. McGUIGAN:  Yes, Your Honor, that is correct.

21           THE COURT:  Unless you sell me the gun, they're

22   going to kill me?

23           MR. McGUIGAN:  Well, I need to protect myself.

24           THE COURT:  Let me hear from the government,

25   please.

1          MR. McGUIGAN:  Yes, Your Honor.

2          MR. DURHAM:  Thank you, Your Honor.

3          It would take quite awhile to drill down and

4     straighten out the inaccuracies, if not outright

5     falsehoods, that have just been put on the record by

6     defense counsel, but let me start here with just one

7     example:

8          Defense counsel's just stood here and told the

9     Court that did he not know who the cooperating individuals

10    were in this case until he read about it in the Hartford

11    Courant.  That is a complete and total falsehood, and

12    counsel has to know that's a complete and total falsehood

13    because he made reference to the fact that he had sent a

14    request to the government to disclose those names.  That

15    part is true.  He said that the government asked him to

16    represent that he would not disclose those names to the

17    press essentially if we provided them.  That part is true.

18    When he tells the Court he never got them, that's a

19    complete falsehood, and counsel has got to know that.

20          On November 24, 2015, Mr. McGuigan agreed,

21    unlike prior to that period of time, that he would not go

22    to the Boston Globe, he would not talk to the Hartford

23    Courant, he wouldn't disclose the information to other

24    media representatives, and once he made that

25    representation, that same day, November 24, 2015, the

1    prosecution in this case sent a letter to Mr. McGuigan

2    identifying the two people who the cooperating witness is.

3            So when he tells the Court that he only learned

4    about this in the Hartford Courant, I mean, maybe he

5    doesn't remember the discovery in this case, maybe he

6    doesn't remember that on the same day he made the

7    representation that he wouldn't disclose the information

8    to the press, the government provided that information to

9    him; and if he has his discovery materials here, which you

10   would think he might want to before he makes such a

11   representation to the Court, he can look at the

12   transmission -- an email transmission, Tuesday,

13   November 24, 2015, 5:06 p.m., to him with the attached

14   letter.

15           That's where I start.

16           Everything that counsel has just said or

17   virtually everything that counsel has just said is

18   irresponsible and designed for nothing other than to

19   generate press interest in this matter.  That's it.

20           When the Court asks him specific questions:

21   What is your specific claim here?  He rambles on for half

22   an hour talking about things that are not responsive to

23   the Court's request.

24           As the government understands the state of the

25   law on a motion to dismiss such as that filed by the

1    defense in this case:

2            Number one, the burden is on the defendant.  And

3    his burden is to prove by a preponderance of the evidence

4    that the government engaged in what he refers to as

5    outrageous government misconduct.  And as the Second

6    Circuit has held, that is a burden which is a heavy one

7    for him to meet.  He doesn't come close to meeting it with

8    rambling on about these various allegations relating to

9    the -- about the paintings and so forth and so on.

10           He's presented no affidavit to the Court.  He

11   talks about or makes reference to what his client told

12   him.  Well, let's talk about his client.

13           His client is a multi-convicted defendant who

14   after he's released on supervised release in this case, as

15   represented to the Court in the filings we've made in

16   response to the motion to dismiss.  We know, we can prove,

17   we can show, that the FBI knew that he, Mr. Gentile, had

18   met with not just the two cooperating witnesses, both of

19   whom were multiple convicted felons, but he had met with

20   three, four, five other convicted felons during the period

21   of the inquiry here.

22           So when he talks about a 77 year old man who

23   just wants to stay at home, he knows that's untrue.

24           Defense counsel says to the Court:  Well, we

25   have some discovery.  Initially he said he didn't have

1   anything by way of discovery before June 14, 2014, which

2   is untrue; and he later corrected himself, not corrected,

3   but he referenced a June 2014 disclosure, specifically a

4   recording.

5          What Mr. McGuigan doesn't tell Your Honor is

6   that with respect to that specific June 3, 2014 recording,

7   Mr. Gentile is meeting with two convicted felons; he's

8   only recently been released himself so that he can be out

9   and about from home confinement; he's meeting with two

10  convicted felons; and during the course of that meeting,

11  as counsel knows -- because not only have we provided the

12  defense with the recordings, we've provided the defense

13  with a transcript of the recordings -- so he knows, the

14  defendant knows that on June 3, 2014, Mr. Gentile is

15  confirming on tape that he had previously told one of the

16  cooperating witnesses that he was in a position to and was

17  planning to engage in a separate fraud involving untaxed

18  cigarettes; and that in fact he have says on tape where

19  it's recorded, usually recorded, he identifies at least

20  generically who the person is that is running the

21  operation, the fact that that person's sister is really

22  the brains of the operation, that the sister is the one

23  that has the stamps to put the bogus stamps on the

24  cigarettes and that as soon as they're in a position to do

25  it, he's going to buy a tractor trailer load of bogus

1    cigarettes to sell.

2           So he's not a 77 year old man just sitting at

3    home who is wanting to enjoy his last few years in life.

4           What he doesn't tell the Court and relates

5    specifically to this case, an indictment returned by the

6    grand jury in this case that on June 3, 2014, Mr. Gentile

7    says in the recording that the FBI got some of my guns but

8    not all of my guns.

9           So the FBI is now on notice of a number of

10   things:

11          Number one, they know that Mr. Gentile is a made

12   member of La Cosa Nostra, because he's told people that,

13   including subsequent to June 3, 2014, he tells an

14   undercover FBI agent that he's a made member of the LCN.

15          So the FBI knows on June 3, he's a made guy.

16   The FBI knows he's on federal supervised release.  They

17   not only know that he's on federal supervised release and

18   now says he's got guns, but they know he's on supervised

19   release from convictions -- for what?  Possessions of

20   multiple firearms, possession of silencers, which they

21   have only one purpose, possession and distribution of

22   drugs.

23          So the FBI has this knowledge.  They're now

24   charged with the knowledge:  Made member of the Mafia,

25   multiple convicted felon, just released from prison on

1    firearms charges including silencers, says he has

2    additional guns.  The FBI is charged with the knowledge

3    because they did a search and counsel makes reference to

4    documents provided to him today, even though it's his

5    burden, Mr. Gentile's burden to establish something here,

6    to meet a burden of proof.  We're prepared to counter

7    whatever it is that counsel has to say.  He puts on any

8    evidence, we're glad to deal with it, we're glad to

9    establish on the record that what he has said to the Court

10   is untrue.  If he puts his client on the stand, how his

11   client is a liar.  We're prepared to do that.  And we've

12   provided counsel with some of the documents that we would

13   be willing to put into evidence -- or if the Court wants

14   us to, we'll put it in anyway -- to establish these facts.

15           But among the items that was provided to counsel

16   that he made reference to are photographs of the search

17   that was done at Mr. Gentile's house back in February of

18   2012.  Why is that significant?  Because now the FBI, not

19   only they are charged with the knowledge he's a Mafia

20   member, he's a convicted felon, he says he has additional

21   guns, but the FBI now knows from the search that separate

22   and apart from the guns that were seized, which were a .22

23   Derringer, a .22 revolver, two .38s and a 12 gauge

24   Mossberg shotgun, they also recovered hundreds of rounds

25   of ammunition for not just .22s, .38s and a 12 gauge

1    shotgun, they recovered ammunition for a .44 caliber

2    weapon, ammunition for a .45 caliber weapon, ammunition

3    for a 30.06 rifle -- and it may have been, I don't want to

4    misstate, it may have been also .32 caliber ammunition.

5    Gun wasn't recovered at the scene.  They know that.

6              They know that while a couple of the guns that

7    were seized in February of 2012 were in holsters, there

8    are multiple, as in maybe a dozen, holsters that were in

9    the house that didn't have guns in them but would

10   reasonably lead one to believe that there are additional

11   guns someplace.

12             The FBI is charged with the knowledge that when

13   they go back to do a search in May of 2012, a follow-up

14   search based on additional information, at that time they

15   seize more drugs, they seize another silencer that was

16   hidden in a different part of the house, and they seize

17   the iron works of the mechanics for a .22 caliber that was

18   hidden along with a silencer.

19             So when you look at these matters from the FBI's

20   perspective or law enforcement's perspective, you have

21   this knowledge.  To suggest that it is outrageous

22   government conduct to then investigate to establish

23   whether in fact gentile does have those guns is in itself

24   the height of irresponsibility.  If Gentile went out and

25   killed somebody or provided the gun for somebody to be

1      killed and it came out the FBI had this knowledge and

2      never did anything about it, there would be understandably

3      a human cry about that.  There would be condemnation of

4      the FBI for not investigating that.

5              So to suggest that to somehow follow up and to

6      investigate this matter is the height of irresponsibility

7      in itself.

8              Separate and apart from that, I think I

9      indicated, but let me repeat, there was .44 ammunition

10     that was seized in February 2012.  The FBI also knew that

11     Patricia Gentile, the defendant's wife, had a .44 caliber

12     pistol that was registered in her name that was not

13     recovered at the scene.

14             The FBI knew that Mr. Gentile back in 1987 had

15     registered himself, even though he's a convicted felon

16     from a 1960's conviction, he registered himself a .38

17     caliber Colt.  As it turns out, it's the gun that the FBI

18     cooperating witness bought from Mr. Gentile.  So they have

19     that knowledge that there is in fact a .44 someplace,

20     there is in fact a .38 someplace.

21             So again, to suggest or to argue that the FBI

22     following up on this is outrageous government conduct, in

23     the government's view, respectfully, is absurd.

24             THE COURT:  Mr. Durham, let me focus your

25     attention very specifically on the moment in time when the

1          government made the decision to, as Mr. McGuigan puts it,

2          inject people into the life of Mr. Gentile.  What was the

3          state of the government's knowledge at that moment?

4                    MR. DURHAM:  If what counsel is referring to is

5          at a point in time when the defendant had been released

6          from prison, if that's the point in time he's talking

7          about, and the notion that we injected people into

8          defendant's life -- the Court ought to know, and I'm sure

9          the defense knows, and certainly the defendant knows, I

10         believe counsel should know -- in terms of injecting

11         people into his life, the two cooperating witnesses in

12         this case and Mr. Gentile had known each other for years

13         and years and years.  They had committed crimes together.

14         The notion that we injected unknown people into

15         Mr. Gentile's life is fatuous.

16                    It is true that with respect to these two

17         individuals, there's one in particular that was close to

18         Mr. Gentile who was asked to approach Mr. Gentile.  They

19         say, why is he asked to approach Mr. Gentile?  Well,

20         Mr. Gentile when he was incarcerated on the first case

21         that was before Your Honor had engaged in conduct with

22         other individuals who were incarcerated with him relating

23         to his possession or access to the Gardner paintings.

24                    This is want counsel wants.  He wants the

25         discovery on this so he can provide it to the Hartford

1    Courant, give it to the Globe, and so forth and so on.

2            But for these limited purposes, I would say to

3    the Court, while Mr. Gentile was locked up, he engaged

4    with more than one person who was locked up with him at

5    Wyatt about his access to the paintings and plans and ways

6    in which they might move the paintings.  That's what the

7    genesis of trying to figure out, okay, what is it that

8    Gentile's doing here?

9            The Court knows from prior pleadings and the

10   pleadings in this case, Gentile was polygraphed, Gentile

11   failed a polygraph on all relevant questions relating to

12   this; he's incarcerated on the case that had been before

13   Your Honor; and he's dealing with more than one person

14   about these paintings.

15           THE COURT:  Mr. McGuigan talked about the

16   statute of limitations.

17           MR. DURHAM:  It is abundantly clear on the

18   public record -- this doesn't come from the United States

19   Attorney's Office in Connecticut, it comes from the FBI in

20   Boston and U.S. Attorney's office in Boston -- if the

21   paintings that are being discussed here are turned in, the

22   person who turns them in, they're not going to get

23   prosecuted, that's not the interest.  But to say somehow

24   nobody can be prosecuted, that's untrue.  Of course if you

25   are in possession of stolen property that was transported

1    in interstate commerce, you are subject to federal

2    prosecution.

3              If it turns out that somebody does come forward

4    and voluntarily produces these paintings, the U.S.

5    government by the U.S. Attorney's Office and the FBI in

6    Boston said they won't be prosecuted, but that's a fair

7    different thing than if the FBI has to investigate this

8    and people are found with them, caught with them, in

9    possession of knowing that's stolen property that's been

10   transported in interstate commerce, they're subject to

11   being prosecuted for that and they would be prosecuted for

12   that.

13             THE COURT:  That's a continuing offense.

14             MR. DURHAM:  Yes, Your Honor.  So I don't know

15   where Mr. McGuigan gets that that you can't be prosecuted

16   because the statute of limitations has run.

17             If Mr. Gentile is in possession or has

18   constructively or actual possession -- obviously he

19   doesn't have actual possession -- constructive possession

20   of these?  If they were turned in voluntarily, yeah, the

21   government has said they're not going to prosecute him or

22   anybody else, but if the government comes about it

23   otherwise, yeah, people are subject to prosecution.

24             THE COURT:  So prior to the time that the

25   government took steps to arrange for the CWs to speak with

1    Mr. Gentile, the government had reason to believe that

2    Mr. Gentile might be in constructive possession of these

3    paintings?

4              MR. DURHAM:  Absolutely, Your Honor.

5              THE COURT:  And the government had a legitimate

6    law enforcement interest in pursuing that possibility?

7              MR. DURHAM:  Absolutely, Your Honor.

8              THE COURT:  And that's what motivated the

9    initial approach to Mr. Gentile?

10             MR. DURHAM:  Yes, Your Honor.

11             And as I say, early on on the recording of

12   June 3, 2014, Mr. Gentile says in a recorded conversation,

13   the FBI got some of my guns but not all of them.

14   Mr. Gentile knows that, Mr. McGuigan knows that.

15             And then as I argued before, and I want to

16   repeat myself:  Once you have a certain body of

17   information, such as we can reasonably conclude from the

18   searches done in February of 2012 and May 2012, and now

19   this convicted felon says he has additional guns, it is

20   ludicrous to say, well, it's outrageous for the government

21   to pursue that.

22             THE COURT:  Mr. McGuigan seemed to suggest that

23   the inducements that were subsequently extended to

24   Mr. Gentile to get him to sell a firearm became

25   unconscionable.  Can you comment on that, please?

1        MR. DURHAM:  Yes, Your Honor.

2        I mean we get into the -- I mean, there's an

3    open criminal investigation, but let me -- I'll address

4    the Court's question.

5        That's completely wrong and that's not what

6    occurred.

7        Obviously we don't have access to, we're not

8    privy to whatever it is the defendant has told his counsel

9    about these matters, but what was represented to the Court

10   as Gentile's explanation of this is completely contrary to

11   the fact.

12       Indeed what happened, in sort of a generic

13   fashion, is that the investigator succeeded in introducing

14   an undercover operative into the situation.

15   Mr. Gentile wanted to sell -- well, the subject matter was

16   the sale or the purchase of stolen paintings.  Those

17   paintings were going to be sold seriatim, $500,000 per

18   piece.  That was the general scenario that was proposed.

19       When Mr. McGuigan talks about the drug part of

20   this, the people who were going to be buying the paintings

21   had a lot of cash because they were drug dealers.  Gentile

22   knew this, he knew who it was because there was a

23   particular name used, he was familiar to him, somebody

24   believed to be involved in large scale of marijuana

25   distribution, hundreds of pounds of marijuana

1    distribution, from years back.  That was the general

2    sense.  Somebody had a lot of cash, willing to put the

3    cash up to buy the paintings, and there was a particular

4    method of what was going to happen to the paintings.  That

5    was the general deal.

6         But Mr. Gentile, who separate and apart from the

7    undercover in this case, Mr. Gentile was involved while on

8    supervised release in criminal conduct beyond setting up

9    frauds involving untaxed cigarettes.

10        Another occasion Mr. Gentile was at another

11   convicted felon's house with two cooperating individuals

12   in this case, and a sample of marijuana was passed by this

13   other convicted felon to the cooperating witnesses as to,

14   you know, what kind of weed that they had available and

15   the cooperating witnesses then provided that

16   information -- provided not just the information but the

17   marijuana that very day to the FBI.

18        So the suggestion that somehow this is a sad old

19   77 year old man who's being taken advantage of, he's in

20   the middle of trying to distribute a sample of marijuana

21   going in the other direction, and we've got that

22   marijuana.  That was while he was on supervised release.

23   That was before any of this came about.

24        But with respect to what happened in the end,

25   Mr. Gentile wouldn't do the deal on the paintings unless

1     the FBI undercover would first do a large-scale drug deal

2     with him.  Again, we're not talking about a few joints or

3     ounces or a bag of weed.  This would be involving hundreds

4     of pounds of marijuana.  And of course the FBI was not

5     going to go forward and distribute hundreds of pounds of

6     marijuana just to make the painting scenario go forward.

7     And that's what ultimately resulted when the undercover

8     said, no, we're not going to do any marijuana deals.  You

9     said you would produce the pictures.  If you're not going

10    to produce the pictures, we're done.  That's essentially

11    how that played out.

12              THE COURT:  What about the claim that

13    Mr. Gentile was induced to sell the gun by a plea from his

14    friend to the effect that unless you give me the gun, my

15    life is in danger, I'll be killed?

16              MR. DURHAM:  Untrue.  With respect to that

17    claim, and counsel has been provided the discovery -- one

18    moment, Your Honor?

19                   (Pause)

20              MR. DURHAM:  He has discovery in the case

21    relating to the guns and so forth.

22              With respect to that part of the investigation,

23    the cooperating witnesses said that he was having a

24    problem with somebody in collecting a drug debt and he

25    needed the weapon in connection with the collection of a

1    drug debt, not that somebody was going to kill him, but it

2    was needed in connection with the collection of a drug

3    debt.

4            And counsel also knows from the discovery in

5    this case that Mr. Gentile had said, yeah, cooperating

6    witness ought to be carrying a gun, and he, Mr. Gentile,

7    ought to be carrying a gun as well.  It was Mr. Gentile

8    who talked about the ability to get a Walther handgun that

9    he could sell -- that he could get for a thousand dollars.

10   He's the one that brought up the Walther, he's the one

11   that brought up a thousand dollars.

12           So the suggestion to the Court or representation

13   to the Court that this was, oh, I'm going to be killed

14   because of what you did in this drug deal, untrue.  That

15   was not what was going on here.

16           In fact, in point -- in connection with the

17   meetings with the undercover agent in this, it's clearly

18   what you would expect in terms of the relationship of the

19   parties.

20           Mr. Gentile made it known to the undercover

21   agent that he was a made man, a soldier in the

22   Philadelphia LCN and he was the one calling the shots.

23   And that was the nature of the relationship.  The

24   undercover never raised his voice, never did anything.  He

25   was trying to put parties together.

1          And, in fact, in connection with again what the

2     FBI is charged with knowing, the FBI agents conducting the

3     investigation and I think it was at the very first meeting

4     that Mr. Gentile had with the undercover, that at a

5     particular point in time Mr. Gentile moved his chair

6     forward into the table and the undercover heard what he

7     believed to be the clink of a firearm in Mr. Gentile's

8     waistband.  Now, he didn't see it, but he believed that

9     Mr. Gentile was armed at that meeting.

10          But in any event, that's the nature of that

11     relationship, Your Honor.

12          THE COURT:  The defendant takes exception to the

13     government going after him in order to bring pressure to

14     bear on him in connection with the Gardner investigation.

15     He says that this is not a legitimate use of the law

16     enforcement or prosecutorial function.

17          In your opposition memorandum, I understand you

18     to say that in fact this is not uncommon for the

19     government to seek to arrest somebody on charge A in order

20     to obtain their cooperation in the investigation of crime

21     B; it's common practice.

22          MR. DURHAM:  Yes, Your Honor.

23          THE COURT:  Do I understand you to be saying

24     that?

25          MR. DURHAM:  Yes, Your Honor.

1          THE COURT:  And is that in fact the case?

2          MR. DURHAM:  It's very common.  It's very -- the

3    Court has obviously had any number of cases before it.

4    You see for example in drug cases, those investigations,

5    not always, but it certainly is common that you start

6    investigating low level drug dealers in anticipation of

7    being able to build up to address the more significant

8    crime problem.

9          It may be that the low level drug dealer in and

10   of itself is not of any particular interest to the federal

11   investigators, but that person is in a position to lead to

12   more significant things.

13         Or if you take it in the context of organized

14   crime cases, it would not be at all uncommon to do an

15   investigation into illegal gaming, bookmaking, where

16   bookmaking may not be as high priority to law enforcement,

17   but the extensions of extortionate lines of credit is; or

18   people who are being extorted in another fashion by people

19   that control that illegal gambling is; or if there are

20   tens of millions of dollars involved and none of those

21   monies are being taxed, and so the public's being deprived

22   of those monies.

23         So in that context, the organized crime

24   investigations, again, it's not at all uncommon to try to

25   work yourself -- investigators to work themselves into a

1    position of addressing lower level crimes in the hope and

2    expectation they can address a more significant crime

3    problem.

4         Here, I'm not sure that there is -- obviously

5    there's a significant public interest in the recovering of

6    these paintings.  That would be a wonderful thing for the

7    culture.  I'm not sure you would say that's of higher

8    priority than taking guns out of the hands of people who

9    are multiple convicted felons and made members of Mafia,

10   but I suppose different people might have a different view

11   of that.

12        All I can tell the Court is that the initial

13   contact with the defendant Gentile that occurred once he

14   got out of prison was in fact generated because he had

15   been dealing with other persons about these paintings.

16   But once you acquire the knowledge about the guns and the

17   like, you can't ignore that.  You have to pursue it.  At

18   least that would be our view.

19        THE COURT:  Is there any standard that applies

20   to your office or the FBI when it comes to targeting

21   individuals in this way?  In other words, for the purpose

22   of seeking cooperation in connection with a pending or

23   prospective investigation.

24        MR. DURHAM:  I don't know that I can point Your

25   Honor to a particular standard, you know, where there

1    would be -- you know, simply there has been information

2    received or there's reasonable suspicion or, you know,

3    some higher standard, but what I can tell the Court and

4    the totality of the circumstances here with respect to

5    these matters, whatever that level may be, it was more

6    than satisfied based on information that had been gathered

7    regarding Mr. Gentile and his involvement with these

8    paintings.

9            I don't remember with respect to some of the

10   detention matters -- we did detention hearings before a

11   magistrate judge.  I think in the first case it may have

12   been brought to Your Honor's attention, we had a detention

13   hearing, and I don't recall that, but for purposes of this

14   record as to what was known, what would provide a

15   reasonable basis for the FBI to inquire into the paintings

16   matter as relates to Mr. Gentile, they're pretty

17   plentiful, including the fact that the FBI had been told

18   by a particular person, the widow of Mr. Gentile's former

19   running buddy, a fellow by the name of Bobby Guarente,

20   that two of the paintings had been given to Mr. Gentile.

21   So they knew that.

22           Investigators in fact learned that Guarente and

23   Gentile at one time point in time attempted to leverage a

24   return of paintings in order to get a reduced sentence for

25   a particular person that Guarente was close to, so they

1     knew that, and investigators corroborated that that had

2     occurred.

3             The investigators were aware of the fact, as

4     relates to Mr. Gentile, he was a made member of La Cosa

5     Nostra because of Bobby Luisi.  Luisi operated out of

6     Boston.  He was made by the Philadelphia crime family.

7     And Luisi himself was indicted in the District of

8     Massachusetts on cocaine charges.  He subsequently

9     cooperated with the government and he subsequently

10    identified Mr. Gaurente as one of the persons he made.  He

11    was -- he, Mr. Gentile, was in Luisi's crew and was

12    operating principally out of Boston.  So they were aware

13    of that.

14            Investigators were aware from the first case

15    that Mr. Gentile had had contact with Mr. Guarente.  They

16    were aware of the fact there were other people reaching

17    out to Mr. Gentile to talk about the paintings.  They

18    were -- this is all before he was released from prison and

19    the most recent contacts made.  They were aware of the

20    fact that Mr. Gentile's counsel said that Mr. Gentile was

21    willing to take a polygraph on this.  He took a polygraph

22    and there was a 99 percent certainty that he was being

23    deceptive, that is, untruthful when he said he didn't know

24    about the robbery before it occurred, he never had any

25    possession of the paintings and he didn't know where the

1    paintings were.  And on those three questions, 99 percent

2    plus likelihood that he's -- he was being untruthful.  So

3    the agents had all of that information prior to the

4    contact that we're talking about.

5          The FBI had information from not one, not two,

6    but at least three people that while Mr. Gentile was

7    incarcerated at Wyatt, he had had conversations with him

8    about access to these paintings.

9          The FBI had in fact received from one of those

10   persons a contract that was written out in Mr. Gentile's

11   hand for what the -- for a debt that that guy would owe in

12   connection with these paintings.  It included the name and

13   telephone number for this person to contact and using a

14   particular code name in order for the people to know that

15   the information about this matter was coming from

16   Mr. Gentile.

17         The agents knew all of that before ever having

18   anybody approach Mr. Gentile once he was released on his

19   federal conviction on the silencers, firearms and drugs.

20         THE COURT:  So to recap by way of explaining

21   what occurred here, you have proffered that the government

22   had reasonable suspicion that Mr. Gentile was in

23   constructive possession of these stolen paintings and on

24   that basis undertook an investigation involving the use of

25   people who were long-time acquaintances; and at an early

1    meeting, Mr. Gentile stated in substance that he was in a

2    position to provide firearms?

3              MR. DURHAM:  He stated in that June 3rd, 2014

4    conversation, I think expressing some disregard for the

5    FBI, but he said that he -- in that conversation that they

6    had gotten some of his guns but not all of them, and then

7    there's some chuckling and so forth going on at that point

8    in the conversation.

9              And counsel has that transcript and he has the

10   recording.

11             THE COURT:  It's my understanding that on that

12   day, June 3, 2014, Mr. Gentile told CW1 that he still had

13   guns and could provide firearms of several types?

14             MR. DURHAM:  Let me see.

15             MR. McGUIGAN:  No.

16             THE COURT:  That's incorrect?

17             MR. McGUIGAN:  That's incorrect, Your Honor.

18             THE COURT:  Ultimately, CW2 asked Mr. Gentile if

19   he would sell him a firearm and Mr. Gentile said he would

20   and this led to the transaction.

21             MR. DURHAM:  That's the subsequent time, yes,

22   Your Honor.

23             On June 3, 2014, that's when he said that he had

24   guns.

25             Can I have just one moment?  I can read it into

1    the record.

2                THE COURT:  Yes.

3                MR. DURHAM:  Just one moment, Your Honor, I'll

4    find the page number for counsel.

5                     (Pause)

6                MR. DURHAM:  Starts on page 96 of the transcript

7    where Mr. Gentile says:  Yep, they took all my -- and I'll

8    leave out the vulgarity, the expletives -- they took all

9    my F'ing money, they took all my F'ing -- all my guns,

10   well, you know, some of them.  Laughter by everybody

11   there.

12               CHS1:  They got all?  Ha, ha, ha.

13               CHS2:  The ones you wanted.  And they're

14   laughing again.

15               And Mr. Gentile says:  Yeah, M-F'ers, they only

16   kept some, a few of them, but we'll save them a little

17   bit.  They really couldn't push the guns too much because

18   the guns were 50 years old.

19               CHS says:  Right.

20               And then Gentile says:  When I first got married

21   I bought an F'ing gun for like, it was $35.  It was a nice

22   .38.

23               And one of the cooperators said:  Right.

24               And then Mr. Gentile says:  I've been shot F'ing

25   eight times I've been shot.  I just kept it near my F'ing

1   bed.

2              One of the cooperators said:  Right.

3              And then Gentile says:  And I bought a couple of

4   other ones, .22s and other stuff, and they, yeah, they got

5   those there and that's that.

6              Cooperator:  Laughs.

7              Gentile says:  That's why.  And then he says

8   something unintelligible.

9              And then Mr. Gentile says:  Well, I mean, if you

10  really need it, if you got to have them, you got to have

11  them.

12             And one of the cooperators says:  Yep, exactly.

13             So that's on June 3.  So they know he's got

14  guns.  The FBI got some of the guns, not all of the guns.

15             And then at a later point in time, it's when it

16  was initiated to see if we could purchase a gun from

17  Mr. Gentile and he sold the gun.

18             THE COURT:  Is it correct that in any such

19  scenario as this, the government would take steps to act

20  on that information?  In other words, it's not personal to

21  Mr. Gentile?

22             MR. DURHAM:  I mean, I can't represent what all

23  FBI would do.  I think in this district if we knew a made

24  member of the Mafia said he had guns and he just came out

25  of prison for being in possession of guns and silencers,

1    that, yes, they would pursue that, and it was pursued in

2    this instance.

3              Again, in the context of what was occurring

4    here, the investigators felt it was pretty good coverage

5    of Mr. Gentile because two people, the cooperating

6    witnesses, who were meeting with him and who were dealing

7    with him and with whom Mr. Gentile said they were going to

8    make a lot of money together, that same conversation that

9    counsel has, that June 3 conversation, they were going to

10   make money and so on and so forth.  So they had pretty

11   good coverage.  They continued the investigation to see if

12   they could play out the purchase -- sale and purchase of

13   the paintings.  It doesn't come to fruition because the

14   FBI isn't going to sell hundreds of pounds of marijuana to

15   Mr. Gentile and his associates.  And at that point then

16   you got to turn to, well, okay, we know he has guns.  It's

17   certainly a reasonable inference from him having

18   ammunition for guns that weren't seized, holsters for guns

19   that weren't seized and his having said in the recorded

20   conversation that the FBI got some of his guns but not all

21   of them, that has weapons.

22             Yeah, I think in most instances, you would say,

23   well, we've got to investigate that.  God forbid he goes

24   and kills somebody and we have this sitting in our files

25   and we never did anything with it.

1           THE COURT:  All right, thank you.

2           MR. DURHAM:  Yes, Your Honor.

3           THE COURT:  Mr. McGuigan?

4           MR. McGUIGAN:  Your Honor, first of all, I've

5    read all of the transcripts but I've also listened to

6    every single minute of them.  And there are many instances

7    where what is transcribed is not what I heard on the

8    tapes.  I don't know who transcribed those.  That's going

9    to be part of my discovery.  I would like to know exactly

10   who transcribed them.  Because I have an issue.  And as

11   Your Honor knows, I've been able to secure an expert to

12   transcribe them themselves.  So we will have what will

13   become an issue at the trial is actually what is said in

14   these things.

15           But I did hear a part where he talks about, they

16   didn't get all these guns, and it was a hoot and a holler

17   and a laugh, laugh.  And when counsel reads "laughs" into

18   the record, it doesn't really capture the essence of the

19   joke and the hilarity to which everybody thought it was

20   very funny.  It was that they didn't get all my guns.  It

21   was, oh, yeah, but they didn't get all of them, and they

22   start laughing.

23           That's pretty much part and parcel what the joke

24   was because it was a joke.

25           MR. DURHAM:  Your Honor, number one, I don't

1      know if counsel is suggesting that the FBI should have

2      said, oh, that's a joke so we shouldn't pursue it.

3                   MR. McGUIGAN:  I'll get to what my point is.

4                   MR. DURHAM:  I don't know if he's saying the .38

5      the FBI ended up buying from him wasn't registered to him

6      and that's the gun in this case.  So I don't know where

7      the joke was other than the fact that the FBI had not

8      gotten all of his guns.

9                   MR. McGUIGAN:  It goes to, Your Honor -- and I

10     believe that brother counsel is getting his information

11     from the 302s as opposed to the transcripts themselves --

12     and the 302's on the June 22 date has sort of become an

13     issue.  It states Gentile told him he would get him the

14     gun as soon as possible and mentioned he wanted to sell

15     the CHS a Walther pistol, a Walther PPK, but that he

16     needed a couple of days to acquire it.  The CHS, which I

17     believe is Mr. Bowes, discussed how he was going to

18     collect the drug money debt that he was owed.  And Gentile

19     advised him on page 22 of said transcript, is what I was

20     referring to, which is what I actually heard with my ears

21     as opposed to what's in the 302, where the CHS is asked by

22     my client:  Do you want to do that?  And the CHS says:  It

23     makes more sense, at least they get paid.  He's talking

24     about somebody getting paid, but it's not somebody paying

25     him.  At least they get paid.  Otherwise they're going to

1    kill me.  That's what I referred to.

2            MR. DURHAM:  Your Honor, this is the difficulty

3    of taking things out of context.

4            Counsel says:  At least they get paid.  Yeah.

5    The "they" in that context is the Mexican suppliers of the

6    100 pounds of weed, not -- that's in the context of what

7    they're talking about, a drug debt that's got to be

8    collected and the money that's owed to the notional

9    suppliers of the marijuana.

10           THE COURT:  All right.  Anything further,

11   Mr. McGuigan?

12           MR. McGUIGAN:  No, Your Honor.

13           THE COURT:  Based on your submissions to date, I

14   think that the motion to dismiss the indictment based on

15   outrageous government misconduct is not well supported.

16           Quoting from a decision of the First Circuit,

17   which I believe is an accurate statement of the law in our

18   circuit, "The outrageousness doctrine permits dismissal of

19   criminal charges only in those very rare instances when

20   the government's misconduct is so appalling and egregious

21   as to violate due process by shocking the universal sense

22   of justice."

23           It's not sufficient for the government to engage

24   in conduct that one might disapprove.  The conduct has to

25   shock the conscience of the court and it has to be conduct

1    that would shock the conscience of any court, and I don't

2    have a basis in the record before me to go to the next

3    step of conducting an evidentiary hearing on this motion.

4         The government has provided an explanation that

5    objectively justifies the decisions that were made to

6    investigate Mr. Gentile.  In the first instance, in

7    connection with his suspected possession of stolen

8    property, and later in connection with his suspected

9    possession of firearms.

10        Given that the government had particularized

11   suspicion for its investigation, this is not a case in

12   which I need to be concerned about the targeting of an

13   innocent person who was simply going about his business

14   only to find himself the victim of a government scheme to

15   try to induce him to engage in criminal activity when the

16   government had no reason whatsoever to think that he had

17   engaged in or would engage in criminal activity.

18        With regard to the inducements that were

19   provided, the law recognizes that in an extreme case

20   involving an unconscionable inducement, due process might

21   be violated, but ordinarily this is left to the entrapment

22   defense.

23        The suggestion that the government's conduct is

24   fairly described as conscience shocking because it was

25   motivated by a desire to try to recover the paintings

1    doesn't provide a basis for a hearing.  I think that there

2    is a legitimate law enforcement interest in attempting to

3    recover the paintings.  As counsel explains, anybody in

4    possession of stolen property that has crossed state lines

5    is fair game for a federal investigation into that

6    continuing offense of possession of stolen property.

7         Beyond that, the government's motive typically

8    is irrelevant in matters of this type.  Certainly under

9    the Fourth Amendment, which governs law enforcement

10   activity in connection with searches, seizures and

11   arrests, including pretextual arrests, motive is

12   irrelevant as long as the conduct itself is not

13   unreasonable, and I have no reason to think that

14   Mr. Gentile is the victim of discrimination or an

15   arbitrary and capricious course of conduct by the

16   government.  It appears to me that anybody similarly

17   situated would find themselves the target of further

18   investigation, and there is no claim here of prosecutorial

19   vindictiveness.  No such claim has been raised.

20        In any case, I don't see any actual evidence of

21   animus motivating the prosecution, I don't see a basis for

22   presuming that it is vindictive, and so based on what you

23   have submitted to me, I don't think that Mr. Gentile is

24   entitled to an evidentiary hearing on his claim and I

25   think that the motion should be denied.  This is not one

1    of those exceedingly rare instances when the government's

2    conduct is so appalling and so egregious as to violate due

3    process.

4              This leaves for further discussion the matter of

5    discovery.

6              Mr. Gentile is planning to try the case and

7    present an entrapment defense, and I think that it's

8    appropriate to ask what additional discovery is in order

9    to enable the defense to properly prepare, specifically

10   with regard to what Mr. McGuigan has characterized as a

11   gap in the government's disclosure covering the period

12   June 3, 2014 to February 7, 2015.

13             MR. McGUIGAN:  While we're waiting, Your Honor,

14   I just would like to clear up the record.

15             I did contact my office about an email that

16   Mr. Durham says that he sent to me; and normally before I

17   go off half-cocked and call people liars and whatnot, I

18   usually check to see if there was some sort of reasonable

19   explanation, a computer glitch as opposed to somebody's

20   being mendacious, I asked my office if there were any

21   emails from the government on the 24th.  She said, yes,

22   one from Kathy Libby, which was sent at 12 --

23   approximately 12:00.  And then I asked her, is there

24   another one from John Durham received around 5:00 p.m.?

25   And she wrote, no, with a bunch of exclamation points.

```
1     Your last email on 11/24 came in at 4:02 p.m. and had
2     nothing to do with Mr. Gentile.
3              So if he sent it and I didn't receive it, it
4     sort of was a glitch, and I bristle at the fact that I
5     would lie to a Court.
6              MR. DURHAM:  Well, I would ask that this be
7     marked, Your Honor, as a Court Exhibit or Government
8     Exhibit.  If we could just get a sticker on it.
9              It's the email that was sent, as well as the
10    letter.
11             Just so the record is complete, the record
12    should reflect that Kathy Libby is my administrative
13    assistant, and so we'd be sure it would get to
14    Mr. McGuigan, I didn't send the email, Ms. Libby did.
15             Government's 1, Your Honor.
16             THE COURT:  Okay.  Would it make sense if I
17    asked you to confer about discovery and see if you can't
18    resolve whatever problems exist and then let me know?
19             MR. DURHAM:  Yes, Your Honor.
20             MR. McGUIGAN:  Yes, Your Honor.
21             THE COURT:  Okay.  Then I'll leave it to you to
22    do that and I'll look forward to hearing from you.
23             Should we plan to talk by phone in the near
24    future?
25             MR. McGUIGAN:  Sooner rather than later, Your
```

1    Honor.  As the trial date is approaching, I'd like to get

2    the discovery if I could.

3              THE COURT:  Okay.

4              MR. McGUIGAN:  Because there's recordings and

5    the transcripts are very -- it's not an easy job to

6    transcribe them.

7              THE COURT:  I'll ask Terri to speak with you

8    about a date in the near future when we can talk, and I'll

9    appreciate your cooperation in trying to sort it out

10   before then.

11             MR. McGUIGAN:  Yes, Your Honor.

12             MR. DURHAM:  Thank you, Your Honor.

13             THE COURT:  Thank you.

14                  (Proceedings adjourned at 3:40 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3               In Re: U.S. vs. GENTILE

4

5

6           I, Darlene A. Warner, RDR-CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages are a true and accurate transcription of

10   my shorthand notes taken in the aforementioned matter to

11   the best of my skill and ability.

12

13

14

15
                    /s/_____
16
                        DARLENE A. WARNER, RDR-CRR
17                       Official Court Reporter
                        450 Main Street, Room #223
18                      Hartford, Connecticut 06103
                            (860) 547-0580
19

20

21

22

23

24

25