UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM. NO. 3:15cr67 (RNC) |
| v. | : | MARCH 24, 2016 |
| ROBERT GENTILE | : | |

GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR DISCLOSURE OF INFORMATION MATERIAL TO THE DEFENSE (DOCUMENT #63)

Comes now the United States, by and through its undersigned counsel, to respond to the defendant's motion for the disclosure of information beyond that previously provided to the defense in the above-captioned matter pursuant to the provisions of Rule 16, Fed.R.Crim.P., and the Standing Order on Discovery in Criminal Cases, Local Rules of Criminal Procedure for the District of Connecticut. In his motion, the defendant seeks an order from the Court requiring that the Government to disclose a wide range of information relating to an ongoing criminal investigation into as yet uncharged conduct. Given the defendant's failure to make an adequate showing for compelling the disclosures he seeks, the breadth of his requests, and the fact that the material he demands is part of an ongoing, uncharged investigation, the Government objects to the defendant's motion.

I   Procedural History Re Defendant's Request for Additional Information

In an earlier pleading in this case, the defendant Gentile moved to dismiss the instant indictment based on a claim of outrageous government conduct that constituted a violation of his due process rights warranting dismissal of the indictment. (Doc. No. 29) On January 6, 2016,

the Court conducted a full hearing on the defendant's claim, and concluded that the defense claim was without merit. The motion was denied from the bench. (Docket entry 58).

On January 21, 2016, the Court conducted a telephone conference with the parties to discuss the defendant's request for the disclosure of additional information as outlined in previous defense demands. (Docket entry 61.) At the conclusion of that telephone conference, the Court directed the defense to file a renewed discovery motion which addressed the justification for each additional item of information being requested.

Thereafter, on February 1, 2016, the defendant filed a "Motion for Disclosure of Information Material to the Defense" that has been designated Doc. No. 63 and is the subject matter of this Government response. On February 4, 2016, the Court scheduled an additional telephone status conference in this matter for February 12, 2016, (Docket entry 64). At the ensuing telephone conference, the Court invited the defendant to file an affidavit setting forth the grounds which he claimed would justify the Court issuing an Order for the broad discovery requests contained in Doc. 63. (Docket entry 68.)

Finally, on or about March 2, 2016, the defense filed an affidavit dated March 1, 2016 that had been signed and sworn to by the defendant Gentile. (Doc. No. 71.)

As set forth below, the claims contained in the defendant's March 1, 2016 affidavit are either false or presented very much out of context. As such, the Government respectfully submits that the defendant has not made an adequate showing to justify ordering the Government to disclose the broad range of materials the defendant seeks in his motion.

II   <u>The Assertions Contained in the Defendant Gentile's Affidavit</u>

With respect to the assertions set forth in the defendant's affidavit dated March 1, 2016,

the Government respectfully notes the following:

1. Claim:  Gentile claims that a Government cooperating witness ("CW-1") "c[a]me to [his] house in a snowstorm" and told him a second cooperating witness ("CW-2") wanted to see him to pay him some money owed to Gentile.  Gentile claims that about a week later he met with both cooperating witnesses and he was paid the money owed to him.  Doc. 71 at 1.

    Facts:   The first meeting involving Gentile and the two cooperating witnesses, both of whom as the defendant well knew were previously convicted felons, took place on June 3, 2014.  There was no unusual weather such as a snowstorm in the Manchester, Connecticut area in late May or early June of 2014.  (Attachment 1).  The recorded conversation that occurred on that date was provided to the defendant as part of discovery in this case inasmuch as it relates directly to the defendant being in possession of firearms and his telling the cooperators of this fact.  Further, in that recorded conversation, the defendant Gentile talked with the cooperators about other criminal activity in which he intended to engage (specifically, a cigarette tax stamp fraud).

2. Claim:  CW-1 wanted the defendant to "meet a guy that he [did] business with with the grass [that is, was involved in the marijuana business].[1] The next time we met at the restaurant [CW-1] brought his friend Nick."  Doc. 71 at 2.

    Facts:    In context, the person who was brought to meet with the defendant was not

---

1 The cooperator involved had known the defendant for a long time and, as noted, was himself a convicted felon.  The defendant was fully aware of this fact and still met with him while on federal supervised release.

named "Nick," but was an undercover FBI employee who was using the alias "Vinnie." Vinnie was identified as an intermediary between his reported boss, "Keith," who the defendant believed was a big time marijuana customer of CW-1. As reflected in Attachment 2,[2] "Keith" was someone who Gentile had known about from his years of involvement with the CW-1, but who Gentile had never met. "Keith" purportedly had a lot of excess cash that he needed to get rid of and so he had Vinnie approach the defendant about purchasing stolen Gardner paintings with some of those funds.

3. Claim:    "Two weeks later, [CW-1] called me and asked if I wanted to get involved with the grass business with Nick.   I said no." *Id.*

4. Facts:    As reflected in the recorded conversations contained in Attachments 2 - 6, the defendant was anything but reluctant to become involved in marijuana trafficking. Indeed, as set forth in the transcript of the recorded conversation identified as Attachment 3, Gentile was aggressively trying to get "Vinnie," the FBI undercover, to have CW-1 disclose the telephone number for his marijuana connection so that when CW-1 died as the result of a terminal medical condition from which he was suffering at the time, they (Gentile and "Vinnie") could keep the marijuana trafficking going. Gentile suggested that the undercover might be able to get the contact number out of CW-1 by telling CW-1that he should give the undercover the number so that Gentile could provide financial support to a relative of CW-1 when CW-1 died.

---

2  The Government is filing Attachments 2 -6 under seal and *ex parte*.   The Government is prepared to give defense counsel full access to the draft transcripts contained in Attachments 2 -6, as well as access to the recordings themselves; however, absent an Order from the Court, the Government is not prepared to provide copies of the recordings and draft transcripts to the defense.   The Government's position is founded on two grounds: first, the materials relate to an ongoing investigation concerning which no charges have been brought.   Second, the Government is concerned about the amount of previously disclosed discovery information in this case which appears to have made its way to media sources.

5. Claim: The defendant makes a further assertion about CW-1 trying to get him involved in prescription pill sales, but he (Gentile) said no. *Id.*

   Facts: Nothing in any of the recordings made by CW-1 or CW-2 reflects that any such conversation ever occurred. Further, neither CW-1 nor CW-2 was ever tasked by investigators with making such a proposal to the defendant. (As noted above, however, CW-1 did have conversations with Gentile regarding his purported marijuana dealings and his various marijuana contacts.)

6. Claim: "[CW-2] said that the guy they're selling the grass to read my name in the paper and knew about the paintings from the Gardner Museum. [CW-2] said[ ] that the guy wanted to buy the paintings so he could sell them to a guy out of the country for a couple of million a piece." *Id.* at 3-4. Further, Gentile stated that "[w]e met with Nick about three more times . . . [CW-1] told me that [Keith] told Nick not to buy anymore grass from [CW-1] if I didn't sell him the paintings. I don't have any paintings, so I told the guy [Nick] that he's stupid. I told him your boss [Keith] is an [expletive]." *Id.* at 4-5.

   Facts: While the defendant Gentile's statement that at some point he said that he did not have any of the paintings would be literally true, , as reflected in Attachments 2-6, the clear import of the recorded conversations is that he has access to the paintings and people who know about the location of the paintings. Further, Gentile made statements making it clear that he was very familiar with the items, including making specific reference to one of the items that he described as being the most valuable one (although in all likelihood he is wrong about his assertion in this regard). And, further,

      Gentile made it clear that he was not satisfied with the amount of money Keith was offering for each painting.

7. Claim: "[CW-1] came to me later and said that he owed $50,000 to the guys in Arizona that he gets the grass from. He couldn't sell the grass to [Keith] because I wouldn't sell the paintings, and he couldn't get rid of the grass he had. He told me that he thought they were gonna kill him." *Id.* at 5.

      Facts: The defendant's statement that CW-1 told him he owed money to the people from whom he had obtained a load of marijuana is certainly true, but nowhere in any of the recordings did CW-1 say he needed a gun to defend himself against people who were going to kill him, nor did investigators ever direct him to tell that to the defendant. In fact, as the defense has to know from the discovery materials already provided in this case, including the recordings from February 5th, 22nd and 27th, 2014, Gentile and CW-1 discussed CW-1's problem of someone owing him drug money, and it was in this connection that CW-1 was looking for a gun. In one of the February 2015 conversations, CW-1 specifically referenced possibly "clipping" someone to make the problem go away and the two men discuss various handguns, including the defendant saying that he had gotten himself a ".22" which was as good as a ".38."

Tellingly -- and importantly -- the defendant's affidavit never even makes the claim that he was somehow induced into committing a crime that he was not otherwise predisposed to commit. Indeed, as the defense well knows from the evidence disclosed in this case, long before the sale of the firearm to CW-1 in March 2015, and specifically on June 3, 2014, Gentile was recorded raising the subject of guns himself and telling two cooperating individuals that when the FBI searched his

house, they found some, but not all of his guns.

### III    The Defendant's Claims Do Not Merit the Broad Disclosure Being Requested

Despite the fact that the defendant's affidavit does not even assert that he was not predisposed to commit the crimes with which he is charged in the instant indictment, and even with the knowledge that the disclosures already made in this case make clear that it was the defendant who first raised the subject of his being in possession of firearms, the defendant seeks an Order from this Court requiring the Government to make disclosure of an extremely broad range of materials that he believes may be part of an ongoing FBI investigation relating to the March 1991 theft of property from the Isabella Stewart Gardner Museum in Boston, Massachusetts.  For example, he seeks an order requiring the disclosure of "[a]ny reports by the Government (302's) describing the information relayed to the Government by any and all cooperating witnesses and/or confidential informants concerning [the defendant] including but not limited to" three named individuals "insofar as such information relates to the subject matter of [the defendant's] motion to dismiss, the investigation of the theft of paintings from the Isabella Stewart Gardner Museum in 1991 and the investigation into the recovery of the

paintings . . . ." Def. Motion at 4.  Similarly, he seeks the disclosure of "[a]ny and all audio or video recordings containing conversations between [the defendant] and any cooperating witnesses/confidential informants . . .", and "[a]ny and all transcripts of audio or video recordings concerning conversations between [the defendant] and any cooperating witnesses/confidential informants"

First, as noted above, the defendant's motion to dismiss has already been denied by the Court after a full hearing as being without merit.  *See* Docket Entry 58.  Second, the defendant's

7

request would seem to require that the Government disclose the identities of confidential informants without any *Roviaro* showing having even been attempted, never mind made. *Roviaro v. United States*, 353 U.S. 53 (1957). Third, and perhaps most importantly, the defendant has failed to make even a close to adequate showing that on a prima facie basis there is evidence suggesting that he lacked the predisposition to commit the crimes on which he stands charged.

The Government notes that the standard type of instruction given to juries on the defense of entrapment would read as follows:

> The defendant asserts as a defense that he was the victim of entrapment by an *agent of the government. While the law permits government agents to trap an unwary criminally-minded* person, the law does not permit the government agents to entrap an unwary innocent. Thus, a defendant may not be convicted of a crime if it was the government who gave the defendant the idea to commit the crime, if it was the government who also persuaded him to commit the crime, and if he was not ready and willing to commit the crime before the government officials or agents first spoke with him. On the other hand, if the defendant was ready and willing to violate the law, and the government merely presented him with an opportunity to do so, that would not constitute entrapment.
>
> Your inquiry on this issue should first be to determine if there is any evidence that a government agent took the first step that led to a criminal act. If you find there was no such evidence, there can be no entrapment and your inquiry on this defense should end there. If, on the other hand, you find some evidence that a government agent initiated the criminal acts charged in the indictment, then you must decide if the government has satisfied its burden to prove beyond a reasonable doubt that prior to first being approached by government agents, the defendant was ready and willing to commit the crime.
>
> If you find beyond a reasonable doubt that the defendant was predisposed that is, ready and willing to commit the offenses charged, and merely was awaiting a favorable opportunity to commit them, then you should find that the defendant was not the victim of entrapment. On the other hand, if you have a reasonable doubt that the defendant would have committed the offenses charged without the government's inducements, you must acquit the defendant.

Modern Federal Jury Instructions-Criminal – Entrapment- Instruction 8-7.

The Second Circuit has held that "predisposition may be shown by evidence of '(1) an existing course of criminal conduct similar to the crime for which the defendant is charged, (2) an

8

already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement.'" *United States v. Brand*, 467 F.3d 179, 192-93 (2d Cir. 2006) (citing *United States v. Brunshtein*, 344 F.3d 91, 101-02 (2d Cor. 2003) (quoting *United States v. Salerno*, 66 F.3d 544, 547 (2d Cir. 1995).)

     Here, the defendant has presented no evidence to the Court supporting the proposition that Gentile was improperly induced to commit a crime he was not already predisposed to commit. Indeed, as stated, the defendant had only recently completed service of a federal sentence for illegal possession of firearms, ammunition and unregistered silencers. In addition, on June 3, 2014 --again, just shortly after he had been released from federal prison -- it was the defendant who volunteered the fact that he still in possession of firearms. Moreover, the defendant does not even claim in his March 1, 2016 affidavit that his will was overborn or he was somehow forced to engage in the criminal conduct at issue in this case. In short, nobody had to induce him to go find a gun or ammunition in this case. Indeed, as the defense also knows from the pretrial disclosures already made in this case, the loaded .38 caliber Colt revolver at issue in the case was *registered to the defendant* in the files of the Connecticut State Police.

     Finally, the Government notes that it is aware of its obligation to disclose information in its files that might tend to show that the defendant was entrapped into committing the offenses contained in the indictment. The Government is not aware of any such information. In this regard, however, as stated above, the Government is prepared to allow defense counsel to review draft transcriptions of consensual recordings made in the ongoing investigation referenced in the

defendant's motion and to listen to the recordings themselves in order to make an independent determination of this fact.

## IV     Conclusion

Based on the foregoing, the Government respectfully submits that the record does not support the granting of the broad ranging request for disclosure of information in a still ongoing, uncharged investigation, and, therefore, the defendant's motion should be denied.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

/s/ John H. Durham

JOHN H. DURHAM
ASSISTANT U.S. ATTORNEY
Federal Bar No. ct05087
157 Church Street, 23rd Floor
New Haven, CT 06510
(203) 821-3700

## **C E R T I F I C A T I O N**

I hereby certify that on March 24, 2016, the foregoing "Government's Response to Defendant's Motion for Disclosure of Information Material to the Defense (Doc. No. 63)" was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

/s/ John H. Durham
_____
JOHN H. DURHAM
ASSISTANT U.S. ATTORNEY